FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

2018 APR 25 P 2:01

WILLIAM W. BLEVINS
CLERK

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| UNDER SEAL | ) | |
| | ) | |
| Plaintiffs, | ) | **18-4234** |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | **SECT. J  MAG. 5** |
| | ) | |
| UNDER SEAL | ) | **FILED IN CAMERA AND** |
| | ) | **UNDER SEAL** |
| Defendants. | ) | |
| | ) | **DO NOT PUT ON PACER** |
| | ) | **DO NOT PUT IN PRESS BOX** |
| | ) | |
| | ) | **DEMAND FOR JURY** |
| | ) | |

Fee 400.00
Process
X Dktd
CtRmDep
Doc. No.

i

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA and )
MEDICAL ASSISTANCE PROGRAMS )
*Ex Rel.* BRENDA PROCTOR )
  )
    Plaintiffs, )
  )
v. )
  )
  )
WOUND CARE MANAGEMENT, LLC )
d.b.a MEDCENTRIS; MEDCENTRIS )
SPECIALTY GROUP; WOUND CARE )
ASSOCIATES L.L.C.; POST ACUTE )
SPECIALTY HOSPITAL OF )
LAFAYETTE, LLC; POST ACUTE )
MEDICAL LLC; POST ACUTE MEDICAL )
SPECIALTY HOSPITAL OF )
COVINGTON; POST ACUTE MEDICAL )
AT HAMMOND LLC; LHC GROUP INC.; )
LHCG XII, L.L.C.; LOUISIANA )
EXTENDED CARE HOSPITAL OF )
LAFAYETTE; PROMISE HEALTHCARE, )
INC.; PROMISE HOSPITAL OF BATON )
ROUGE, INC.; PROFESSIONAL )
REHABILITATION HOSPITAL, L.L.C )
PROMISE HOSPITAL OF MISS LOU; )
AMELIA MANOR, INC.; OAKWOOD )
OF ACADIANA LLC; ARKANSAS )
ELDER OUTREACH OF LITTLE ROCK )
INC.; LAFAYETTE GENERAL MEDICAL )
CENTER, INC.; BATON ROUGE )
GENERAL MEDICAL CENTER )
  )
    Defendants. )
  )
  )

**18-4234**

Civil Action No.

**SECT. J    MAG. 5**

**FILED IN CAMERA AND
UNDER SEAL**

**DO NOT PUT ON PACER
DO NOT PUT IN PRESS
BOX**

**DEMAND FOR JURY**

ii

## TABLE OF CONTENTS

Introduction ................................................................................................................... 1

Jurisdiction and Venue ................................................................................................. 5

Parties ........................................................................................................................... 6

APPLICABLE LAW ................................................................................................... 12
    A.   The Federal False Claims Act ......................................................................... 12
    B.   Louisiana Medical Assistance Programs Integrity Law ............................... 13
    C.   The Medicare Program and Material Conditions of Payment ....................... 14
        1.   Payment for Service based on Physician Fee Schedule ............................... 15
        2.   Payment for Service based on Prospective Payment System ....................... 16
        3.   Items or services specifically excluded from Medicare Coverage ............... 18
        4.   The Applicable Local Coverage Determination ........................................... 20
        5.   Wound Debridement Background ................................................................. 20
        6.   The Department of Health and Human Services Have Scrutinized Up-coded and Medically Unnecessary Surgical Debridements ................................................................ 24

DEFENDANTS FRAUDULENT SCHEMES .............................................................. 26
    A.   Defendants Train and Encourage Medicare and Medicaid Fraud ............................. 26
        1.   MedCentris Trains Employees to Perform Unnecessary Surgical Debridements ............ 26
        2.   The MedCentris Pay Structure Encourages and Incentivizes Fraud ..................... 29
        3.   MedCentris' Providers Are Medicare Billing "Outliers" ............................... 34
        4.   MedCentris President Todd Shaffett Details MedCentris' Conspiracy with LTAC Facilities and Specifically Instructs Relator Proctor to Knowingly Submit False Claims. ...... 36
        5.   Facility Defendants Pressure and Coerce MedCentris Providers to Perform Unnecessary Services. ......................................................................................................... 40
    B.   MedCentris Internal Auditors Have Identified False Claims Yet MedCentris Continues to Encourage and Mandate Fraud. ................................................................ 42
    C.   MedCentris Knowingly Performs Medically Unnecessary Surgical Debridements. 44
    D.   MedCentris Routinely Performs Medically Unnecessary and Up-coded Evaluation and Management Visits ................................................................................................. 54
        1.   Medicare Evaluation and Management Guidelines. .................................... 55
        2.   MedCentris' Fraudulent E/M Practices. ...................................................... 58

COUNT ONE ............................................................................................................... 65

COUNT TWO ............................................................................................................... 66

COUNT THREE ........................................................................................................... 67

COUNT FOUR ............................................................................................................. 68

COUNT FIVE ............................................................................................................... 70

COUNT SIX ................................................................................................................. 71

COUNT SEVEN ........................................................................................................... 73

COUNT EIGHT ........................................................................................................... 74

COUNT NINE .............................................................................................................. 75

## *QUI TAM* COMPLAINT

Relator Brenda Proctor, on behalf of herself, the United States, and the State of Louisiana Medical Assistance Programs, alleges and claims against Defendant Wound Care Management, LLC, d.b.a. MedCentris, and other named Defendants as follows:

### Introduction

1.      This *qui tam* complaint alleges Defendant Wound Care Management L.L.C. d.b.a. MedCentris ("MedCentris"), violated the False Claims Act (31 U.S.C. § 3729 et. seq.) by submitting, conspiring with its co-defendants to submit, and causing the submission of false claims for payment to federal and state government health care programs, including the Medicare and Medicaid programs, by systematically billing federal and state government health care programs for medically unnecessary and often contra-indicated services.      Specifically, MedCentris has routinely billed Medicare for medically unnecessary, falsely "up-coded" and harmful wound debridements, as well as medically unnecessary and up-coded patient evaluation and maintenance (E/M) services.      Further, MedCentris and other named Defendants have submitted, conspired to submit, and caused the submission of false claims by billing federal and state government health care programs for facility fees and inpatient and outpatient care attendant to MedCentris' unnecessary services.

2.      MedCentris provides contract-based wound care services to various health care facilities, including outpatient clinics, nursing facilities, Long-Term Acute Care facilities, and hospitals. This business model consists of MedCentris securing a contract with these facilities to service patients' wound care needs, then sending MedCentris employees into those facilities to provide such care. However, in providing this wound care, MedCentris systematically operates by maximizing its billing with complete disregard for the Medicare conditions of payment,

medical necessity of the services provided, and legitimate care needs of its patients. Rather, MedCentris routinely bills Medicare for a substantially higher reimbursement service than is actually provided or is necessary, and often for services that are contra-indicated and harmful to its patients.

3.      MedCentris aggressively markets its scheme to health care facilities by boasting that its billing system and medical practices can artificially boost the taxpayer-funded reimbursements to health care facilities, generating surplus revenue for the facilities with no added costs. Enticed by such promises of free cash, the health care facilities contract with MedCentris and actively encourage MedCentris' employees to come into their facilities and provide medically unnecessary and harmful services – betraying the trust of their patients, the State of Louisiana, and the United States – so the facilities can fraudulently increase their revenues at taxpayers' cost.

4.      The cornerstone of MedCentris' fraud – and attendant patient harm – is a wound care procedure known as "surgical debridement." Wound debridement is defined as the process of removing necrotic, nonviable/dead tissue from pressure ulcers, burns, and other acute and chronic wounds to expose healthy tissue and can often be a necessary procedure to promote wound healing.[1] There are several different methods of debridement, including mechanical debridement, enzymatic debridement, autolytic debridement, selective debridement, and surgical debridement.

5.      Surgical debridement is a highly aggressive, last-resort procedure, wherein a surgeon uses a scalpel, curette, or other sharp instrument to cut into the wound and dig out

---

[1] Wound Ostomy and Continence Nurses Society; Methods of Wound Debridement: Best Practice for Clinicians available at:
http://c.ymcdn.com/sites/www.wocn.org/resource/resmgr/Publications/Methods_of_Wound_Debridement.pdf?hhSe archTerms=%22

unhealthy tissue, causing the wound to bleed.  It can cause the patient considerable physical and emotion distress. As the name conveys, "surgical debridement" is a serious surgical procedure, often performed by a surgeon in an operating room with general anesthesia[2] and only on the most extensive necrotic wounds in the most dire cases, after all other debridement efforts have failed. Surgical debridement is not only the most drastic and painful method of debridement; it is also the most lucrative.

6.      To capitalize on the high Medicare reimbursement for surgical debridement procedures, MedCentris mandates that employees skip less invasive debridement procedures, perform surgical debridements upon first assessment of a wound patient, and subsequently perform surgical debridements on a weekly basis – regardless of the patient's need for this invasive, painful, and debilitating procedure.  In some cases, MedCentris performs surgical debridements in direct contradiction to other physicians' orders and despite those patients' unstable conditions, which may render a surgical debridement procedure life-threatening. Further, when surgical debridement is performed on wounds that are not severe enough to justify a surgical debridement, on a weekly basis and over an extended period, these procedures can be counter-productive to healing.  For these patients, the weekly cutting and digging into their wounds becomes a seemingly endless nightmarish loop of wound exacerbation by relentless cutting, which is then used to justify more cutting—always generating payment and profit for MedCentris and its contracted facilities.

7.      Additionally, many of the surgical debridements MedCentris bills to Medicare are "up-coded," meaning MedCentris routinely falsely represents and requests payment for a more substantial and higher reimbursing surgical debridement procedure than was actually performed.

---

[2] *Id.*

8.    As a result of MedCentris' repetitive, medically unnecessary and up-coded surgical debridements, the facilities that contract with MedCentris are able to bill Medicare and Medicaid at a falsely inflated and higher rate for patient care provided – theoretically because patients' hospitalization and general care are more intensive due to these procedures.    In addition, the contracted facilities receive a facility fee reimbursement for every medically unnecessary procedure performed by MedCentris. MedCentris specifically markets its services as revenue-increasing for contracted facilities, and, as of this writing, MedCentris has these arrangements—essentially contracts to commit fraud—with nineteen facilities in Louisiana and MedCentris operates one outpatient wound clinic, in Vicksburg, Mississippi.

9.    After the contracted facilities agree to allow MedCentris to perform wound care on their patients, the facilities expect the revenue boost that MedCentris has promised.    In anticipation of these inflated reimbursements, the contracted facilities automatically bill as though MedCentris providers will perform surgical debridement procedures, even prior to patient admission or assessment. In other words, without any assessment, wound patients are scheduled under billing codes for surgical debridement.    To ensure that the revenue-generating surgical debridements are being performed, both MedCentris and its contracted facilities harass and intimidate MedCentris clinicians who do not universally perform surgical debridements— regardless of medical need.  The potential for debridement-boosting revenue is highest for Long-Term Care Hospitals (LTCHs), also known as Long-Term Acute Care Facilities (LTACs), due to the extensive and long-term care needs of their patients.  Consequently, LTCHs make up the majority of MedCentris' contracted facilities, and pressure is greatest upon MedCentris clinicians in these facilities to perform medically unnecessary surgical debridements.  For patients in these

facilities, it is a pain-for-payment proposition, with the pain inflicted on the patients and the payments lining the pockets of MedCentris and its contract facilities.

10.    The repetitive—typically weekly—surgical debridements performed by MedCentris keep wound care patients under MedCentris' care and in LTCHs receiving inpatient care, because MedCentris' uniform protocol of performing the most extensive and invasive wound care procedure on patients, week after week, actually prohibits patients' wounds from healing and consigns them to serve as MedCentris' cash-cows.  MedCentris is then able to perform other medically unnecessary procedures on its captive patients, further fraudulently increasing its Medicare and Medicaid payments. With patients so confined, MedCentris additionally bills government health care programs for medically unnecessary and up-coded Evaluation and Management visits, along with other aggressive, high-reimbursing, and medically unnecessary wound care procedures such as application of Skin Substitute products and Hyperbaric Oxygen Therapy.  Consequently, the State of Louisiana and the United States are bilked out of much-needed health care funds, while patients suffer agonizing surgical treatments that exacerbate their wounds.

### Jurisdiction and Venue

11.    This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act").    Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

12.    Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because MedCentris is headquartered in Hammond, Louisiana and its primary business office is in Covington, Louisiana.  Defendants qualify to do business in the state of Louisiana, transact substantial business in the state of Louisiana, transact substantial business in this judicial district,

and can be found here. Additionally, and as described herein, Defendants committed within this judicial district acts proscribed by 31 U.S.C. § 3729. Specifically, Defendants: (a) submitted, caused to be submitted, and conspired to submit within this judicial district false claims to Medicare and Medicaid for wound care procedures and evaluation and management visits that were never performed or were unnecessary, unreasonable, or improper and claims for falsely inflated and unnecessary inpatient care; (b) made and used false records material to such false claims; and (c) knowingly concealed or knowingly and improperly avoided or decreased obligations to repay or transmit money to the United States.

## Parties

### A. The MedCentris Defendants

13.     Defendant Wound Care Management, LLC is a corporate entity, registered in the State of Delaware with a Principal Business Office in Covington, Louisiana that operates as MedCentris.

14.     Defendant MedCentris is a company owned by Dr. Shaun Carpenter and Todd Shaffett, which purports to offer medical facilities a "solution" to wound care needs through its "Comprehensive Wound Management Programs." MedCentris is a Registered Trade Name in Louisiana, registered to Wound Care Management, LLC and headquartered in Hammond, Louisiana and has its primary offices in Covington, Louisiana.

15.     Defendant MedCentris Specialty group is an alter-ego of Defendant MedCentris.

16.     Defendant Wound Care Associates, L.L.C. is a Louisiana corporate entity that operates as an alter-ego of MedCentris. Dr. Shaun Carpenter is the Member, Manager of Wound Care Associates, L.L.C. and Todd Shaffett is a Member of Wound Care Associates, L.L.C. Defendants Wound Care Management, LLC; MedCentris; MedCentris Specialty Group and

Wound Care Associates, L.L.C. will be collectively referred to in this Complaint as "MedCentris" or "the MedCentris Defendants."

**B. The Facility Defendants**

17.     Defendant Post Acute Medical, LLC operates 16 "Specialty Hospitals" and is based in Enola, Pennsylvania.  Many of Defendant Post Acute Medical, LLC's hospitals have contracts with MedCentris, whereby MedCentris performs unnecessary and up-coded services to fraudulently increase Post Acute Medical, LLC's reimbursement from government health care programs.

18.     Defendant Post Acute Specialty Hospital of Lafayette, LLC is a subsidiary of Post Acute Medical, LLC and operates Post Acute Medical Specialty Hospital of Lafayette in Lafayette, Louisiana. Post Acute Medical Specialty Hospital of Lafayette has a contract with MedCentris, whereby MedCentris performs unnecessary and up-coded services to fraudulently increase Post Acute Medical Specialty Hospital's reimbursement from government health care programs.

19.     Defendant Post Acute Specialty Hospital of Covington is a subsidiary of Post Acute Medical, LLC and operates Post Acute Medical Specialty Hospital of Covington in Covington, Louisiana. Post Acute Medical Specialty Hospital has a contract with MedCentris whereby MedCentris performs unnecessary and up-coded services to fraudulently increase Post Acute Medical Specialty Hospital's reimbursement from government health care programs.

20.     Defendant Post Acute Medical at Hammond, LLC is a subsidiary of Post Acute Medical, LLC and operates Post Acute Medical Specialty Hospital of Hammond in Hammond, Louisiana. Post Acute Medical Specialty Hospital of Hammond has a contract with MedCentris,

whereby MedCentris performs unnecessary and up-coded services to fraudulently increase Post Acute Medical Specialty Hospital's reimbursement from government health care programs.

21.    Defendant LHC Group, Inc. is a Delaware corporation that specializes in the post-acute continuum of care, primarily for Medicare beneficiaries.  LHC Group operates numerous LTAC facilities in Louisiana that contract with MedCentris, whereby MedCentris performs unnecessary and up-coded services to fraudulently increase LHC Group's reimbursement from government health care programs.  LHC Group has a principal business office in Lafayette, Louisiana.

22.    Defendant Louisiana Extended Care Hospital of Lafayette is an LTAC facility owned and operated by LHC Group.  Louisiana Extended Care Hospital of Lafayette has a contract with MedCentris, whereby MedCentris performs unnecessary and up-coded services to fraudulently increase Louisiana Extended Care Hospital of Lafayette's reimbursement from government health care programs.

23.    Defendant Promise Healthcare, Inc. is a corporation headquartered in Boca Raton, Florida that operates LTAC facilities around the country, including five facilities in Louisiana and one in Mississippi.  Multiple Promise Healthcare, Inc. facilities have contracts with MedCentris, whereby MedCentris performs unnecessary and up-coded services to fraudulently increase Promise Healthcare's reimbursement from government health care programs.

24.    Defendant Promise Hospital of Baton Rouge, Inc. is a Louisiana corporation that operates Promise Hospital Baton Rouge, an 82-bed LTAC facility in Baton Rouge, Louisiana. Promise Hospital Baton Rouge has a contract with MedCentris, whereby MedCentris performs unnecessary and up-coded services to fraudulently increase Promise Hospital Baton Rouge's payments from government health care programs.

8

25.    Defendant Professional Rehabilitation Hospital, L.L.C. is a Limited Liability Company registered to do business in Louisiana and based in Baton Rouge, Louisiana. Professional Rehabilitation Hospital, L.L.C. is operated by Defendant Promise Healthcare, Inc. and is the applicant entity that registered the trade name Promise Hospital of Miss Lou.

26.    Defendant Promise Hospital of Miss Lou is a 40-bed LTAC facility located in Vidalia, Louisiana.  Promise Hospital of Miss Lou has a contract with MedCentris, whereby MedCentris performs unnecessary and up-coded services to fraudulently increase Promise Hospital of Miss Lou's payments from government health care programs.

27.    Defendant Amelia Manor, Inc. operates a 151-bed skilled nursing facility with for-profit, corporate ownership located in Lafayette, Louisiana.  Amelia Manor, Inc. has a contract with MedCentris, whereby MedCentris performs unnecessary and up-coded services to fraudulently increase Amelia Manor, Inc.'s payments from government health care programs.

28.    Defendant Oakwood of Acadiana, L.L.C. operates River Oaks Retirement Manor—a Medicare-approved skilled nursing facility in Lafayette, Louisiana. Oakwood of Acadiana, L.L.C., in its operation of River Oaks Retirement Manor, has a contract with MedCentris, whereby MedCentris performs unnecessary and up-coded services to fraudulently increase Oakwood of Acadiana's payments from government health care programs.

29.    Defendant Arkansas Elder Outreach of Little Rock, Inc. is a non-Louisiana-based corporation that operates Pelican Pointe Healthcare and Rehabilitation in Maurice, Louisiana. Pelican Pointe Healthcare and Rehabilitation has a contract with MedCentris, whereby MedCentris performs unnecessary and up-coded services to fraudulently increase Oakwood of Acadiana's payments from government health care programs.

9

30.    Defendant Lafayette General Medical Center, Inc. (LGMC) operates the Wound Care and Hyperbaric Healing Center at LGMC in Lafayette, Louisiana.  The Wound Care and Hyperbaric Healing Center at LGMC has a contract with MedCentris, whereby MedCentris performs unnecessary and up-coded services to fraudulently increase Lafayette General Medical Center, Inc.'s payments from government health care programs.

31.    Defendant Baton Rouge General Medical Center operates the Advanced Wound Care & Hyperbarics clinic at the Baton Rouge General Hospital – Mid City Campus.  The Advanced Wound Care & Hyperbarics clinic has a contract with MedCentris, whereby MedCentris performs unnecessary and up-coded services to fraudulently increase Baton Rouge General Medical Center's payments from government health care programs.

32.    The Defendants described in Paragraphs 16 through 30 will be collectively referred to in this Complaint as "the Facility Defendants."

### C.  The *Qui Tam* Relator

33.    Relator Brenda Proctor is a Family Nurse Practitioner employed by MedCentris from January 2016 through April 2017.  In this role as an advanced practice registered nurse, with Certified Wound Ostomy Continence Nurse (CWOCN) credentialing, Relator Proctor's duties were to provide advanced wound care in LTAC settings, acute care settings, and nursing home facilities.  However, from the beginning of her employment with MedCentris, Relator Proctor realized that MedCentris' entire business was predicated upon its willingness to commit fraud, both by up-coding the services and procedures performed, and routinely performing medically unnecessary services and procedures.  When Relator Proctor first questioned the propriety of MedCentris' fraudulent practices, she was "coached" by MedCentris co-owner Todd Shaffett on providing wound care the "MedCentris Way," which amounted to systematic up-

coding and unnecessary procedures, as well as instruction on how to avoid scrutiny from Medicare auditors. When Relator Proctor continued to question MedCentris' practices and refuse to perform unnecessary procedures, she faced intimidation and retaliation from both MedCentris and staff employed at multiple contracted facilities. Relator Proctor eventually voluntarily left her employment with MedCentris, in large part because of her fear of losing her medical license due to the harmful and fraudulent care she was forced to provide by MedCentris. Since leaving MedCentris, Relator Proctor has continued to work in wound care in the Lafayette, Louisiana area. In her new position, Relator Proctor cares for patients that have been or are still under MedCentris' care and, accordingly, has knowledge of MedCentris' ongoing fraudulent, unnecessary, and harmful practices of abusing patients and bilking the State of Louisiana and United States through the heavily-strapped, taxpayer-funded Medicare and Medicaid systems.

34.    Prior to filing this Complaint, Relator Proctor voluntarily disclosed to the United States the information upon which this action is based. To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3739(e)(4)(A), Relator Proctor is the original source of the information for purposes of that section. Alternatively, Relator Proctor has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relator Proctor voluntarily provided such information to the Government before filing this Complaint. Relator Proctor is serving contemporaneously herewith upon the United States Department of Justice a statement of the material evidence in her possession upon which her claims are based.

## APPLICABLE LAW

### A. The Federal False Claims Act

35.    The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*: that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" (3)"knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government;" (4) "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" or (5) conspires to commit a violation of the False Claims Act is liable to the United States for a civil monetary penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus treble damages. 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G).

36.    Under the FCA, (1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud.  31 U.S.C. § 3729(b)(1).

37.    The FCA also defines the term "claim" as (A) any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i)  is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and

12

if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. 31 U.S.C. § 3729(b)(2).

### B. Louisiana Medical Assistance Programs Integrity Law

38.    The Louisiana Medical Assistance Programs Integrity Law ("LMAPIL"), LSA-R.S. 46:437.1, *et seq.* was enacted to combat and prevent fraud and abuse committed by health care providers participating in the medical assistance programs and by other persons and to negate the adverse effects such activities have on fiscal and programmatic integrity. LSA-R.S. 46:437.2

39.    The LMAPIL largely mirrors the Federal False Claims Act and provides that "No person shall knowingly present or cause to be presented a false or fraudulent claim… No person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim… No person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs… No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim… No person shall knowingly submit a claim for goods, services, or supplies which were medically unnecessary or which were of substandard quality or quantity." LSA-R.S. 46:438.3(A-E).

40.     Violation of the LMAPIL incurs a civil fine up to three times the amount of actual damages sustained by the Louisiana Medical Assistance Programs and additional civil monetary penalty between $5,500 and $11,000 for each false or fraudulent claim, misrepresentation or other act prohibited by the LMAPIL.  LSA-R.S. 46:438.6

41.     The LMAPIL, provides the following definitions

    a.  Claim is defined as: "any request or demand, whether under a contract or otherwise, for money or property, whether or not the state or department has title to the money or property, that is drawn in whole or in part on medical assistance programs funds" that is presented to an officer, employee, or agent of the state or department or made to a contractor, grantee or other recipient if the money or property is to be spent under a federal or state program. LSA-R.S. 46:438.3(5).

    b.  "False or fraudulent claim" means a claim which the health care provider or his billing agent submits knowing the claim to be false, fictitious, untrue, or misleading in regard to any material information. LSA-R.S. 46:438.3(7).

    c.  "Material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. LSA-R.S. 46:438.3(13)

**C. The Medicare Program and Material Conditions of Payment**

42.     The Medicare Program is established under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, and provides health insurance coverage for eligible citizens.  The United States Department of Health and Human Services, specifically the Center for Medicare and Medicaid Services ("CMS"), oversees the administration of Medicare.

43.     CMS administers many aspects of the Medicare program through contracts with third-party Medicare Administrative Contractors (MACs). 42 U.S.C. § 1395kk-1.  Through these contracts, MACs perform the following functions, among others, in the administration of the Medicare program: determination of payment amounts, making payment, and reviewing the activities of medical providers including medical, utilization, and fraud review. 42 U.S.C. § 1395kk-1; 42 U.S.C. § 1395ddd.

**1.  Payment for Service based on Physician Fee Schedule**

44.    Some products and services, including debridement procedures and Evaluation and Management (E/M) services, are paid for by Medicare on a Physician Fee Schedule which reimburses providers based on their submission of claims containing various codes—along with required supporting documentation—assigned to each product or procedure provided to the patient.  There are numerous sets of codes that correspond to different diagnoses and procedures by which Medicare classifies and accordingly pays for products and services.  One set of such codes are the CMS's Healthcare Common Procedure Coding System (HCPCS), which is based closely on the American Medical Association's Current Procedural Terminology (CPT) codes. *See* 42 C.F.R. § 414.2; MEDICARE CLAIMS PROCESSING MANUAL at § 30.6.

45.    In order to claim reimbursement from Medicare, physicians and physician practices must submit CMS Form 1500, a standard claim form.  *See* CMS Form 1500. The provider must describe the type of service provided using CMS's Healthcare Common Procedure Coding System (HCPCS), along with required supporting documentation. *See* 42 C.F.R. § 414.2; MEDICARE CLAIMS PROCESSING MANUAL at § 30.6.

46.    Therefore, when providers report Level I HCPCS CPT codes and supporting documentation, the MAC relies on these codes and the supporting documentation to determine what service was performed.  Based on such submissions from providers, the MAC will then pay the provider when the decision is made that Medicare can reimburse for the services.

47.    HCPCS CPT Codes (CPT codes) consist of five digits and can span from 00000-99999. Each code corresponds to a different product and/or service and is reimbursed according to the product and/or service provided.

48.     Therefore, the precise CPT code that a medical provider submits constitutes a claim for payment that is material to Medicare's decision to provide reimbursement for such product or service.

49.     The direct payment that MedCentris and the Facility Defendants receive from MedCentris purportedly performing wound care services, such as wound debridements and E/M services, is provided materially based upon the CPT code under the Physician Fee Schedule.

**2.  Payment for Service based on Prospective Payment System**

50.     Other types of medical care are paid for by Medicare based on a Prospective Payment System (PPS). Medicare pays for the inpatient care provided to patients admitted to MedCentris' contracted inpatient facilities according to a PPS. *Medicare Claims Processing Manual; Chapter 3 – Inpatient Hospital Billing § 150.5.* The PPS classifies patients at LTCH facilities—and the reimbursement for each patient—by Long-Term Care Diagnostic-Related Groups (LTC-DRGs). *Id. at § 150.7.* LTC-DRGs are based on the existing CMS DRGs used under the acute care hospital inpatient PPS but have relative weights specific to LTCH patients. These relative weights reflect the average relative cost of cases in the group compared with that of the average LTCH case. *Id.*

51.     LTAC (Long-Term Acute Care) facilities or Long Term Care Hospitals (LTCHs) are certified according to Medicare Guidelines and generally treat medically complex patients who require long-stay hospital-level care. Medicare Claims Processing Manual; Chapter 3 – Inpatient Hospital Billing § 150.1.  For Medicare payment purposes, LTCHs are generally defined as having an average inpatient Length of Stay (LOS) of greater than 25 days.  *Id.*

16

52.     In fiscal year (FY) 2017, Medicare utilized 989 separate LTC-DRG codes.[3]  The inputs to formulate the appropriate LTC-DRG for a given patient are the principal diagnosis; any additional diagnosis; *the procedures performed during the stay*; and the age, gender, and discharge status of the patient.  *Medicare Claims Processing Manual; Chapter 3 – Inpatient Hospital Billing § 150.7* (emphasis added).

53.     However, Section 1886(m)(6) of the Social Security Act, as added by Section 1206(a)(1) of the Pathway for Sustainable Growth Rate (SGR) Reform Act of 2013 (Pub. L. 113-67), amended the LTCH PPS and created two separate payment categories for LTCH patients: (1) Standard and (2) Site-Neutral.  Under this new payment provisions, LTCH continued to receive the LTC-DRG weighted payment for patients who met certain criteria.[4]  If patients do not meet this clinical criterion, they are paid based on a "site-neutral" basis, which is the lesser of an "IPPS-comparable" payment amount or 100 percent of the estimated cost of the case.  For discharges occurring during cost reporting periods between October 1, 2015 and September 30, 2017, a transition payment will be made for site-neutral cases on a 50-50 blend, known as a blended payment, of the standard payment rate and the site neutral payment rate.  After September 30, 2017, the site-neutral payment policy went into full effect.  Many of the inflated and false claims submitted by MedCentris-contracted LTCH facilities during the time that the transition "blended" payment was in effect have continued under the site-neutral policy.

---

[3] See FY 2017 MS-LTC-DRG File available at https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/LongTermCareHospitalPPS/ltcdrg.html

[4] Criteria for LTC-DRG payment is the patient must (1) have been admitted directly from an IPPS hospital during which at least 3 days were spent in an Intensive Care Unit (ICU) or Coronary Care Unit (CCU), but the discharge must not be assigned to a psychiatric or rehabilitation MS-LTC-DRG in the LTCH; or (2) Have been admitted directly from an IPPS hospital and the LTCH discharge includes the procedure code for ventilator services of at least 96 hours (ICD-10-CM procedure code 5A1955Z) but must not be assigned to a psychiatric or rehabilitation MS-LTC-DRG in the LTCH. See: https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/Downloads/MM9015.pdf

54.    One mechanism utilized by the Medicare program to control costs in LTCH care is "Short-Stay Outliers" (SSOs). *Medicare Claims Processing Manual; Chapter 3 – Inpatient Hospital Billing § 150.9.1.1.* A Short-Stay Outlier (SSO) is a case that has a covered length of stay between one day and up to and including 5/6 of the average length of stay for the LTC-DRG to which the patient is grouped. Therefore, if the patient is discharged prior to being in the LTCH for more than 5/6 of the average length of stay, the LTCH will typically not receive the full LTC-DRG payment, but either 120 percent of the cost of the case or 120 percent of the LTC-DRG specific per diem payment. As detailed herein, MedCentris instructs clinicians to manipulate patient care to avoid SSO reductions. Such manipulations generally involve performing surgical debridements that are contraindicated in order to keep patients in the hospital longer than medically necessary.

### 3.    Items or services specifically excluded from Medicare Coverage

55.    It is a universal requirement of the Medicare program that all items and services provided to Medicare beneficiaries must be reasonable and medically necessary. *See* 42 U.S.C. §1395y(a)(1)(A). Medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code. MEDICARE CLAIMS PROCESSING MANUAL at § 30.6.1

56.    Federal law authorizes Medicare administrative contractors ("MACs") and fiscal intermediaries ("FIs") to issue determinations as to the extent of Medicare coverage for particular items or services. *See* 42 U.S.C. 1395ff. Accordingly, Medicare MACs and FIs publish local coverage determinations ("LCDs"), establishing requirements for and limitations of coverage of specific services. *See* 42 U.S.C. 1395ff(f)(2)(B). Medicare will not pay for services that do not comply with the requirements set forth in LCDs. *See Id.;* 42 U.S.C. 1395y.

57.     Providers submit claims for payment to Medicare and Medicaid for services based on the Physician Fee Schedule using CMS Form 1500.  Each time MedCentris or one of the Facility Defendants submitted CMS Form 1500, it certified that the claim was true, accurate, and complete.  Further, each submission of Form 1500, MedCentris certified that the services for which payment was requested were medically indicated and necessary for the health of the patient.

58.     CMS Form 1500 also provides notice that "[a]ny person who knowingly files a statement of claim containing misrepresentation or any false, incomplete or misleading information be guilty of a criminal act punishable under law and may be subject to civil penalties." *See* CMS Form 1500.

59.     Submission of claims for payment for inpatient care based on PPS systems uses CMS Form 1450.  *See* CMS Form 1450.  Each time one of the Facility Defendants submitted a claim to the United States through the MAC, using CMS Form 1450, the contracted facility certified the claim was true, correct, and complete and complied with all Medicare laws and regulations.

60.     The Louisiana Medicaid System requires providers to submit an annual certification that certifies that "all services rendered during [that year] were necessary and medically indicated."  This form—the EDI Annual Certification of Electronic Files—also requires providers to certify that they agree to adhere to the published regulations of the United States Department of Health and Human Services and the regulations, policies, criteria, and procedures of BHSF Medical Assistance Program, including those rules regarding recoupment.

### 4.  The Applicable Local Coverage Determination

61.     Novitas Solutions, Inc. is the MAC for Louisiana and Mississippi and publishes LCD determinations that govern payment for services provided by MedCentris.

62.     Specifically, Novitas Solutions, Inc. has published LCD L35125 ("Wound Care LCD"), which governs the provision of "Wound Care."[5]  This Wound Care LCD governs Medicare Part A and Part B wound debridement services claims in Louisiana and Mississippi. The Wound Care LCD provides: "It is not appropriate to bill Medicare for services that are not covered (as described by this entire LCD) as if they are covered."  As detailed herein, MedCentris habitually and systematically ignores the conditions of payment of the Medicare program and specifically the Wound Care LCD in its provision of debridement procedures—yet requests and receives payment from Medicare for such procedures.

### 5.  Wound Debridement Background

63.     Wound debridement is the process of removing necrotic, nonviable/dead tissue from pressure ulcers, burns, and other acute and chronic wounds to expose healthy tissue; it may be necessary for optimal wound healing.[6]  Debridement of dead/necrotic tissue, senescent cells, and biofilm removes obstacles to healing; reduces the bioburden (a potential nutrient source for bacteria); decreases odor; and permits visualization of the wound.

64.     Necrotic tissue, the primary tissue that is often removed by debridement, varies in appearance and form.  "Slough" is moist, devitalized tissue that can be soft or fibrous in

---

[5] Local Coverage Determination (LCD): Wound Care (L35125). Available at: https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=35125&ContrId=316&ver=50&ContrVer=1&CntrctrSelected=316*1&Cntrctr=316&s=All&DocType=Active&bc=AggAAAQAAAAA&

[6] Wound Ostomy and Continence Nurses Society; Methods of Wound Debridement: Best Practice for Clinicians available at:
http://c.ymcdn.com/sites/www.wocn.org/resource/resmgr/Publications/Methods_of_Wound_Debridement.pdf?hhSearchTerms=%22debridement%22

character. Color can be brown, yellow, green, or gray, and it can be firmly or loosely adhered to the underlying tissue. "Eschar" occurs when necrotic tissue is exposed to air, becomes desiccated, and forms a thick, leathery brown or black crust on the wound. In common parlance, necrotic tissue is often thought of as a "scab" and for certain wounds the healing process is facilitated by removing the scab to allow the underlying wound to continue to heal.

65.     However, not all wounds should be debrided. In some cases, it may be better to leave necrotic tissue in place than remove it and create an open wound which might not heal.

66.     Therefore, determining whether or not to debride a wound is an essential initial decision when genuinely assessing a wound care plan. If the clinician determines that a wound would benefit from debridement, the next decision is to determine which of the numerous methods of debridement is appropriate. "Selecting the appropriate method of debridement requires careful assessment of the patient, goals of care, characteristics of the wound, setting and skill level of the clinician, and availability of resources."[7]

67.     Under the applicable Wound Care LCD, the following types of debridement are detailed as appropriate Wound Care Management:[8]

> Mechanical Debridement: Removes necrotic tissue by cleansing, or applying a wet–to-dry or dry-to-dry dressing technique. It is generally not considered a skilled service.
>
> Enzymatic Debridement: Uses topical enzymes and works directly on devitalized tissue or indirectly by dissolving the collagen that attaches to the wound bed.

---

[7] *Id.* citing Sibbald, R. G., Goodman, L., Woo, K. Y., Krasner, D. L., Smart, H., Tariq, G.,…Salcido, R. S. (2011). Special considerations in wound bed preparation 2011: An update. Advances in Skin & Wound Care, 24(9), 415-436 available at: https://www.ncbi.nlm.nih.gov/pubmed/21860264.

[8] Local Coverage Determination (LCD): Wound Care (L35125). Available at: https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=35125&ContrId=316&ver=50&ContrVer=1&CntrctrSelected=316*1&Cntrctr=316&s=All&DocType=Active&bc=AggAAAQAAAAA&

Enzymatic Debridement is used when the necrotic substances to be removed from a wound are protein, fiber, and collagen.

Autolytic Debridement: Occurs when the enzymes that are naturally found in wound fluids are sequestered under synthetic dressings. Autolytic debridement is indicated where manageable amounts of necrotic tissue are present and there is no infection.

Maggot / Larvae therapy: Uses medical-grade maggots in wound for removing devitalized tissue, disinfection, and promotion of wound healing. Using this method, debridement occurs as larvae introduce proteolytic enzymes to promote rapid removal of devitalized tissue.

Selective Debridement: Involves the removal of specific, targeted areas of devitalized or necrotic tissue from a wound along the margin of viable tissue by sharp dissection utilizing scissors, scalpel, curettes, and/or tweezers/forceps. Selective debridement typically requires no anesthesia and generally has no or minimal associated bleeding.

Surgical Debridement: Occurs only if material has been excised and is typically reported  for the treatment of a wound to clear and maintain the site free of devitalized tissue, including but not limited to necrosis, eschar, slough, infected tissue, biofilm, abnormal granulation tissue, etc., and should be accomplished to the margins of viable tissue.

68.    Of these numerous types of debridement that are indicated by the Wound Care LCD as appropriate care, selective debridement and surgical debridement are the only two methods for which Medicare provides reimbursement for the service component of the procedure.

69.    The primary clinical difference between selective and surgical debridement is that, in a selective debridement procedure, the provider does not remove living tissue, while living tissue is removed in a surgical debridement.  Surgical debridement is also the most painful and traumatic of all debridement procedures for the patient.  In terms of profitability, there are two key factors that set surgical debridement apart from all of the other procedures: (1) Medicare payment for surgical debridement is much higher; and (2) Only surgical debridement procedures result in large increases to the Facility Defendants' DRG payments.

70.     Surgical debridement is further segmented into different procedures with different CPT codes and Medicare payment amounts based on the depth of living tissue that is removed. Under the CPT codes and Medicare payment structure, the more living tissue that is removed, the more invasive and significant the procedure and thus the higher the payment. This creates an unintended perverse incentive whereby the deeper MedCentris cuts into a wound and the more living tissue it removes, the more it gets paid.

71.     For a surgical debridement to the subcutaneous tissue and removal of subcutaneous tissue—the layer of tissue directly beneath the skin—the provider would use CPT code 11042 for the first 20 sq. centimeters of subcutaneous tissue removed and CPT code 11045 for each additional 20 cm sq. of subcutaneous debridement performed. The next depth is surgical debridement to muscle tissue level and removal of muscle—for which the provider would use CPT code 11043 for the first 20 sq. centimeters of muscle removed and CPT code 11046 for each additional 20 cm sq. of muscle debridement performed. The deepest surgical debridement is surgical debridement to the bone level and requires removal of bone. For a bone debridement, a provider would use CPT code 11044 for the first 20 sq. centimeters and CPT code 11047 for each additional 20 cm sq. of bone debridement performed.

72.     As selective debridement does not remove living tissue below the wound, the depth of a selective debridement is not a factor and only uses CPT Code 97597 for the first 20 cm sq. and CPT code 97598 for each additional 20 cm sq.

73.     The Medicare payment for surgical debridement is much greater than for selective debridement. The following represents the Medicare payment for Participating Providers[9] for each procedure:[10]

---

[9] Participating Providers are those providers who have signed an agreement to accept to accept the Medicare-approved amount as full payment for covered services for all Medicare covered services. See CMS Form 460.

| Code | Procedure | Fee Schedule Payment when performed in Office Setting | Fee Schedule Payment when Performed in Facility Setting |
|---|---|---|---|
| | **Selective Debridements** | | |
| 97597 | selective debridement; less than 20 sq. cm. | $70.10 | $23.30 |
| 97598 | selective debridement; additional 20 sq. cm. | $23.37 | $10.95 |
| | **Surgical Debridements** | | |
| 11042 | surgical debridement; Subcutaneous tissue; less than 20 sq. cm | $110.50 | $61.80 |
| 11043 | surgical debridement; Muscle level; less than 20 sq. cm. | $221.64 | $157.97 |
| 11044 | surgical debridement; Bone level; less than 20 sq. cm. | $308.68 | $235.78 |
| | **Additional Area Surgical Debridements** | | |
| 11045 | surgical debridement; Subcutaneous tissue; additional 20 sq. cm | $39.75 | $26.69 |
| 11046 | surgical debridement; Muscle level; additional 20 sq. cm. | $72.74 | $57.78 |
| 11047 | surgical debridement; Bone level; additional 20 sq. cm. | $124.15 | $102.82 |

### 6. The Department of Health and Human Services Have Scrutinized Up-coded and Medically Unnecessary Surgical Debridements

74.     The Department of Health and Human Services, Office of Inspector General (HHS-OIG) published an advisory report detailing problematic issues with Medicare payments for surgical debridement (the "Advisory Report").[11]  Pursuant to the report, the "mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the

---

[10] The following reimbursement amounts represent the amount paid by Novitas Solutions for the following procedures in Louisiana (outside New Orleans) at the beginning of 2017. See https://www.novitas-solutions.com/webcenter/portal/MedicareJH/FeeLookup?_adf.ctrl-state=pozvzxj0c_104&_afrLoop=901167486824599#!%40%40%3F_afrLoop%3D901167486824599%26_adf.ctrl-state%3D1837skvage_4

[11] Department of Health and Human Services, Office of Inspector General. Medicare Payments For Surgical Debridement Surgical Debridement Services in 2004; OEI-02-05-00390; May 2007; available at: https://oig.hhs.gov/oei/reports/oei-02-05-00390.pdf

health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections."[12]  Accordingly, the purpose of the Advisory Report was to identify how patients may be endangered and harmed through improper use of surgical debridement and the results of the HHS-OIG investigation are disturbing.

75.    This Advisory Report, published in 2007, reviewed surgical debridement claims submitted in 2004 and found that "sixty-four percent of surgical debridement services in 2004 did not meet Medicare program requirements, resulting in approximately $64 million in improper payments" and attendant patient harm.  Further, HHS-OIG found that "higher cost services were less likely to meet program requirements."  Because the highest cost service is surgical debridement, which involves the cutting away of living tissue and bone, the harm to patients in these instances is drastic.

76.    Specifically, HHS-OIG found that 21 percent of sampled billings of surgical debridements were up-coded and resulted in an estimated $19 million in improper payments in 2004.  The report also found that of the services that were miscoded, 47 percent were not actually surgical debridements at all yet were billed as such and, further, that 20 percent of miscoded services were billed with a surgical debridement code that did not accurately reflect the level of tissue, muscle, or bone removed during the debridement.

77.    HHS-OIG further reported that some surgical debridement services were not medically necessary because the medical records indicated that the wounds did not need to be debrided.  In describing such medically unnecessary surgical debridements, HHS-OIG provided the example of medically unnecessary surgical debridement occurring when the "record contained a description of a wound with healthy pink tissue and no evidence of infection."  The

---
[12] Id.

surgical removal of living tissue and/or bone under such instances is not only unnecessary but creates unnecessary pain and severe harm to the patient.

78.     Because HHS-OIG has determined that payments made for up-coded and medically unnecessary surgical debridements—and specifically surgical debridements for wounds with healthy tissue and no evidence of infection—are improper, it is beyond question that correct coding and medical necessity are material conditions of payment for surgical debridement claims.  *See Universal Health Services, Inc. v. U.S.*, 136 S.Ct. 1989, 2003 (U.S.,2016).

## DEFENDANTS FRAUDULENT SCHEMES

### A.  Defendants Train and Encourage Medicare and Medicaid Fraud

### 1.  MedCentris Trains Employees to Perform Unnecessary Surgical Debridements

79.     Relator Brenda Proctor was actively recruited and hired by MedCentris as an Advanced Practice Registered Nurse (APRN), Nurse Practitioner (NP) in December 2015 and immediately recognized that MedCentris was training and incentivizing its employees to commit systematic Medicare fraud.

80.     In her initial orientation, held at MedCentris' offices in Covington, Louisiana, Amanda Estapa, a MedCentris employee charged with training new employees, instructed Relator Proctor on the MedCentris' business model and how MedCentris' billing practices would alleviate any medical decision-making.  Specifically, Ms. Estapa informed Relator Proctor through use of a week-by-week timeline of patient care that she was expected to perform weekly surgical debridements on each patient in an LTAC facility under MedCentris' care, beginning with the initial debridement in week 1—without any initial or ongoing assessment of whether surgical debridement or some other debridement procedure was appropriate.  In other words,

Relator Proctor was instructed that all patients receive surgical debridement—period. Furthermore, throughout the entirety of her orientation, no debridement technique besides surgical debridement was presented as a treatment option or discussed. Therefore, it was abundantly clear to the trainees that, upon the first week of treatment, MedCentris' providers were to immediately perform a surgical debridement—the most extensive and lucrative type of debridement procedure—and then repeat that treatment plan on a weekly basis, regardless of the condition of the wound or attendant patient harm.

81.    Based on her years of wound care experience, Relator Proctor found this emphasis on initial and consecutive surgical debridement appalling. MedCentris did not mention or present any of the other options of debridement, including autolytic, enzymatic or biological debridement—all of which can be effective, cause less trauma (but are far less lucrative), and are detailed in the applicable LCD for Wound Care (L35125) as options for active wound care management. However, the service component of those non-surgical debridement treatments are not reimbursable by Medicare and therefore shunned by MedCentris as eroding MedCentris' profit model. In fact, MedCentris and some Facility Defendants went so far as to remove an industry-leading enzymatic debridement agent, Santyl, from the Facility Defendants' formularies to prevent providers from using this clinically proven and cost-effective debridement technique.

82.    Further, Relator Proctor found it problematic that MedCentris, in its general on-boarding orientation, was dictating to medical providers—who are required to exercise independent medical judgment—a plan of care to encompass all possible clinical situations. MedCentris removed all medical decision-making from the health care providers and replaced it with its own corporate profit-model, one that mandated the most extreme procedure for all patients, regardless of their individual needs or conditions, or the pain, suffering, and harm that

might result.

83.     In her initial orientation, Relator Proctor's preceptor and trainer Amanda Estapa explained the money value proposition that MedCentris provides to Long Term Care Hospitals, stating that "*the LTCHs love [MedCentris] being in their facilities because we make them a lot of money. You have to make the LTCHs financially dependent upon you.*" With this information, and as she would later learn in full, Relator Proctor began to realize that MedCentris was not only automatically performing the most invasive and high-reimbursing procedures to fraudulently boost its own revenue and the facilities' fee for service reimbursements—it was also causing the facilities to receive a higher DRG rate, simultaneously fraudulently boosting the facilities revenue and falsely incentivizing the facilities to use MedCentris.

84.     In her orientation clinical training, Relator Proctor followed Amanda Estapa on clinical rounds to learn how MedCentris expected Nurse Practitioners to conduct their practice. In these training rounds, Relator Proctor witnessed how MedCentris performs barbaric and unnecessary surgical debridements. Specifically, Relator Proctor witnessed Amanda Estapa perform a bone debridement on an elderly African-American male patient on her initial visit to the patient. This patient presented with an unstageable pressure ulcer on his coccyx. Without any explanation to Relator Proctor of why a bone-level surgical debridement was the appropriate treatment, Ms. Estapa proceeded to cut all the way into the patient's bone. This procedure—when medically necessary—is often done under general anesthesia. Relator Proctor recalls the barbaric nature of the procedure as the patient screamed in pain with only minimal topical and subcutaneous anesthetic to numb the pain. As the patient continued to writhe and scream in pain, Ms. Estapa ordered a minimal 1 mg dose of Dilaudid to attempt to provide some pain relief. However, this pain medication was apparently too little, too late as the patient's screams did not

decrease in the slightest. The man was forced to endure torture for no apparent medical reason and only to fraudulently boost profits.

85.    Through her experience as a wound care provider, Relator Proctor knows that a bone level debridement is an extremely serious procedure. Bone level debridements are a rare procedure in most settings; in fact, many wound professionals, including surgeons, never perform a bone debridement in their entire careers. Following this patient's bone debridement, Relator Proctor asked Ms. Estapa if she had any lab work or other medical evidence to justify performing this excruciating procedure. Ms. Estapa simply replied that she knew that the wound had been there a long time (despite this being her first visit to the patient) and therefore she believed the patient may have an infection.

86.    At multiple instances throughout her employment—beginning at her orientation and training—Relator Proctor asked her superiors, "*Why do we have to jump immediately to surgical debridements, when we have not tried any of the less invasive, less painful, less expensive methods of debridement?*" The answer she received was invariably "*because we are just so much more aggressive here at MedCentris.*" It was clear to Relator Proctor that MedCentris' "aggressive" philosophy was based solely on maximizing government health care payments and that clinical decision-making and appropriate patient care were not considerations.

87.    After this initial experience, Relator Proctor was on notice that MedCentris was performing unnecessary surgical debridements. However, she would soon learn the extent of the systematic pressure imposed on clinicians to perform unnecessary debridements and maximize profits.

## 2.    The MedCentris Pay Structure Encourages and Incentivizes Fraud

88.    MedCentris' compensation package to clinical employees, including nurse

29

practitioners like Relator Proctor, is based entirely on the amount of income MedCentris receives from that clinical employee's patient care.  To compute employee pay, MedCentris uses Weighted Value Units (WVUs), metrics through which a numeric value is assigned to the different services MedCentris provides.  WVUs are based exclusively on the reimbursement that the specific service receives from Medicare.  The higher the reimbursement, the higher the WVU the employee earns for performing that service.  Further, the WVU metric has no accounting for or consideration of quality of care, patient satisfaction, or achieving actual healing of patients' wounds.  Accordingly, MedCentris' highest-paid clinical employees are the ones who perform the most surgical debridements and who cut the deepest into living tissue and bone.  The deeper that you cut, the more you get paid, and there is no need to worry about the pain caused to the patient because patient satisfaction and healing are non-factors.

89.    The compensation package provides for 70 percent of the clinical employee's compensation to be guaranteed "salary."  However, this base salary still equates to the employee recording 160 WVUs per two-week pay period.  MedCentris policy is that the remaining 30 percent of the employee's salary is "Productivity Income" and requires the employee to record an additional 40 WVUs per pay period.  Therefore, to earn what MedCentris purports and advertises to prospective employees to be a base compensation package, an employee must record a total of 200 WVUs per two-week pay period.

90.    MedCentris also offers that a clinical employees' "30% Productivity Income" can serve as a bonus if the employee exceeds the 40 WVUs per pay period mandated as Productivity Income.  For instance, if the MedCentris nurse practitioner (NP) achieved a total of 225 WVUs per pay period, that NP would earn an annual bonus of $11,467 above the 100 percent base package.  Achieving 250 WVUs would earn a $29,648 bonus.  Achieving 275 WVUs would earn

a $47,829 bonus.

91.     Importantly, upon the presentation of this offer, MedCentris does not provide employees with any information about how WVUs are calculated; MedCentris simply assures clinicians that "with the patient census in their area, they will have no problem meeting productivity."

92.     However, as Relator Proctor learned, achieving any Productivity Income to meet 100 percent of her promised income requires the MedCentris provider to commit habitual Medicare fraud.

93.     The vast majority of a MedCentris NP's duties consist of managing patients' wounds, which under the MedCentris-mandated plan of care consists of performing (1) surgical debridements and (2) E/M visits between weekly, consecutive, surgical debridements.  The table below highlights MedCentris' WVU weights assigned to each CPT code; the highlighted codes correspond to debridement codes:

CPT Code Examples and Corresponding WVU Weights

| cpt4code | NP WVU | cpt4code | NP WVU | cpt4code | NP WVU |
|----------|--------|----------|--------|----------|--------|
| 10060 | 0.4 | 15277 | 1.6 | 99213 | 0.8 |
| 10061 | 0.8 | 15278 | 0.4 | 99214 | 0.8 |
| 10140 | 0.4 | 15860 | 0.8 | 99215 | 0.8 |
| 10160 | 0.8 | 16020 | 0.4 | 99221 | 0.4 |
| 10180 | 1.6 | 16025 | 0.8 | 99222 | 1.6 |
| 11004 | 2.4 | 16030 | 1.2 | 99223 | 1.6 |
| 11042 | 0.8 | 17250 | 0.4 | 99231 | 0.8 |
| 11042-59 | 0.4 | 17250-59 | 0.2 | 99232 | 0.8 |
| 11043 | 1.6 | 20220 | 0.8 | 99233 | 0.8 |
| 11043-59 | 0.8 | 20670 | 1.6 | 99254 | 0 |
| 11044 | 2.4 | 27613 | 1.6 | 99291 | 1.6 |
| 11044-59 | 1.2 | 29445 | 0.8 | 99304 | 0.4 |
| 11045 | 0.2 | 29445-59 | 0.4 | 99305 | 1.6 |
| 11045-59 | 0.1 | 29581 | 0.4 | 99306 | 1.6 |
| 11046 | 0.2 | 29581-59 | 0.2 | 99307 | 0.8 |
| 11046-59 | 0.1 | 29584 | 0.2 | 99308 | 0.8 |
| 11047 | 0.2 | 31500 | 0.8 | 99309 | 0.8 |
| 11055 | 0.2 | 69210 | 0.4 | 99310 | 0.8 |
| 11056 | 0.2 | 75710 | 1.6 | 99356 | 0.8 |
| 11100 | 0.4 | 76942 | 0.4 | 99357 | 0.8 |
| 11100-59 | 0.2 | 92950 | 1.6 | C1300 | 0 |
| 11101 | 0.2 | 93041 | 0.4 | C9349 | 0 |
| 11719 | 0.2 | 93922 | 0.8 | C9349JW | 0 |
| 11720 | 0.2 | 93923 | 0.8 | G0277 | 0.4 |
| 11721 | 0.2 | 97597 | 0.4 | G0463 | 0.4 |
| 11730 | 0.4 | 97597-59 | 0.2 | Q4101 | 0.4 |
| 11750 | 1.2 | 97598 | 0.2 | Q4101JW | 0.4 |
| 12031 | 1.6 | 97598-59 | 0.1 | Q4102 | 0.4 |
| 12035 | 2.4 | 97602 | 0.4 | Q4102JW | 0.4 |
| 15002 | 0.4 | 97605 | 0 | Q4106 | 0.4 |
| 15004 | 2.4 | 97605-59 | 0 | Q4106JW | 0 |
| 15100 | 2.4 | 97606 | 0.4 | Q4110 | 0.4 |
| 15110 | 2.4 | 99183 | 0.8 | Q4110JW | 0 |
| 15271 | 1.2 | 99201 | 0.2 | Q4117 | 0.4 |
| 15271-59 | 0.6 | 99202 | 0.4 | Q4117JW | 0 |
| 15272 | 0.4 | 99203 | 1.6 | Q4131 | 0.4 |
| 15273 | 0.4 | 99204 | 1.6 | Q4132 | 0.4 |
| 15274 | 0.4 | 99205 | 1.6 | Q4132JW | 0 |
| 15275 | 1.2 | 99211 | 0.2 | Q4133 | 0.4 |
| 15275-59 | 0.6 | 99212 | 0 | Q4133JW | 0 |
| 15276 | 0.4 | | | | |

94.    The highlighted CPT codes and corresponding WVU allotments are for different debridement procedures. CPT Codes 11042 to 11044 are used for surgical debridements and escalate in depth—and thus reimbursement—of debridement. Code 11042 is a surgical

debridement for the first 20 centimeters of skin cut away to subcutaneous skin level. Code 11043 is surgical debridement of the first 20 centimeters to the muscle level. Code 11044—earning MedCentris NPs 2.4 WVUs, the highest amount of any possible procedure—is surgical debridement of the first 20 centimeters to the bone level. Codes 11045 to 11047 correspond to each additional 20 centimeters of skin debrided to subcutaneous level (11045), muscle level (11046), and bone level (11047)—which essentially require the same work as the first 20 centimeters but are reimbursed at a much lower rate, do not significantly boost contracted facilities DRG payments and therefore garnering only 0.2 WVUs each.

95.    Code 97597 corresponds to selective non-surgical debridement. Because it receives a far lower reimbursement than surgical debridements, it only provides 0.4 WVUs.

96.    As MedCentris clinical employees' pay is conditioned upon performing high volumes of high-reimbursement procedures—primarily surgical debridements—MedCentris care providers that take an evidence-based, patient-specific course of treatment as required by the Wound Care LCD are unable to achieve their full promised compensation package.

97.    After weeks of not meeting her "productivity" portion of her salary, Relator Proctor made repeated requests to be provided with the WVU table, *infra*, in order to determine what adjustments she needed to make in order to earn her full 100% salary as promised by MedCentris upon her employment offer. MedCentris Chief Administrative Officer Tasha Mears provided Relator Proctor the WVU table on May 4, 2016.

98.    Upon review of the WVU table, Relator Proctor immediately alerted COO Ammy Taylor of its obvious implications: that in order to make "productivity," she and other MedCentris providers needed to perform E/M visits on 25-30 patients per day (impossible because at the time Relator Proctor had a patient census of 13 patients) or perform recurrent,

repeated surgical debridements. In this same email, Relator Proctor informed Ammy Taylor that she had researched Medicare LCDs on surgical debridements, understood the standards for medical necessity, and knew that performing the debridements required to make her full salary would wholly flaunt the Medicare regulations. Relator Proctor also informed Ammy Taylor that MedCentris should be aware that medically unnecessary surgical debridements have come under scrutiny from the Office of Inspector General and the Department of Justice pursuant to the False Claims Act.

99.    In response, Ammy Taylor instructed Relator Proctor that MedCentris wanted to help "educate" Relator Proctor by sending MedCentris President Todd Shaffett as a resource to spend "education and auditing time with [Relator Proctor] in person, to review Relator Proctor's patients' clinical status, documentation and medically necessary care where applicable."

100.    Despite the claim that MedCentris would "educate" Relator Proctor, it was clear MedCentris wanted simply to fire her. The next day, May 6, 2016, after Relator Proctor sent the email highlighting the fact the WVU system essentially mandated fraud to make salary, as well as the False Claims Act implications of such fraud, MedCentris posted a job opening on Indeed.com for a Wound Care NP in Lafayette. This was at a time when MedCentris did not have the census to provide one NP with the "guaranteed productivity," without performing repetitive surgical debridements. The writing was on the wall for Relator Proctor: she had called out the "MedCentris Way" as a fraud, and she would have to go.

### 3.  MedCentris' Providers Are Medicare Billing "Outliers"

101.    Because MedCentris trains and incentivizes its employees to bill Medicare as much as possible without regard for medical necessity, MedCentris providers bill government health care programs far more than their counterparts providing the same services and far more

than the medical community as a whole.

102.    For instance, in 2015, MedCentris NP Amanda Estapa—the MedCentris employee charged with training new employees to the "MedCentris Way"—ranked second of 298 NPs in Louisiana in total amount paid by Medicare.[13]  To earn this ranking, Medicare paid over $149,000 for Ms. Estapa's billed services (although she billed Medicare for even far more).[14]  In 2015, Ms. Estapa's average services per patient (14.6) and average amount paid per patient ($638) put her in the top 10 percent of billings for all NPs in Louisiana in both categories. In contrast, the average NP in Louisiana performed approximately four services per patient, receiving an average reimbursement of $123 per patient.[15] Specifically, Ms. Estapa's aggregate billing data demonstrate that she is an outlier in the precise procedures mandated to be performed, regardless of medical necessity by MedCentris—surgical debridements and E/M services.   In 2015, Ms. Estapa performed 1,154 separate services for E/M code 99232 (Subsequent hospital inpatient care, typically 25 minutes), an average of 8.2 visits per patient, whereas her peers averaged only 2.6 of these services per patient.[16]  Ms. Estapa's debridement practices are also evident: her second and third most frequent services are for subcutaneous level wound debridement and additional surface area of subcutaneous wound debridement, combining for a total of 1,131 services.  Notably, five or fewer Louisiana NPs even performed this service at all in 2015.[17]

103.    Similarly, Monique Consoer, another MedCentris employee that trains other MedCentris employees in the "MedCentris Way," also bills Medicare far more than her industry

---

[13] *https://projects.propublica.org/treatment/doctors/1457552424*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*

peers. For instance, in 2015, Ms. Consoer was the number one highest-billing provider in her specialty of Adult Health Nurse Practitioners in the State of Louisiana, receiving over $245,000 from Medicare (although, like Ms. Estapa, she billed Medicare for even far more).[18] Ms. Consoer was also in the top 10 percent of providers for average services per patient (18.3) and in the top 10 percent for average paid per patient ($883).[19] Ms. Consoer also primarily bills Medicare for E/M services and debridements and does so far in excess of her industry peers. In 2015, Ms. Consoer billed 2,998 "moderate level" E/M services under code 99232, billing this code for 86 percent of her patients and averaging 12.6 separate moderate level E/M visits under code 99232 per patient.[20] On average, her peers in her specialty performed four moderate-level E/M visits under code 99232. Ms. Consoer also billed 1,993 separate surgical debridement services in 2015.[21] Again, five or fewer providers in her specialty even performed these surgical debridement services that year.[22]

### 4. MedCentris President Todd Shaffett Details MedCentris' Conspiracy with LTAC Facilities and Specifically Instructs Relator Proctor to Knowingly Submit False Claims.

104.    On May 9, 2016, MedCentris President Todd Shaffett came to the LHC Louisiana Extended Care facility in Lafayette, Louisiana to "educate" Relator Proctor. However, this "education" was nothing more than an exertion of pressure from the very top reiterating the "MedCentris Way"—and a hands-on and in-depth tutorial on how to most effectively commit Medicare fraud.

105.    During this fraud tutorial, the MedCentris President visited several patients with

---

[18] *ProPublica. Treatment Tracker, Search Louisiana, Monique Consoer RN, APRN available at: https://projects.propublica.org/treatment/doctors/1154690394 (last visited March 16, 2018)*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*

Relator Proctor in order to show her how to increase her WVU productivity and boost MedCentris' payments from Medicare. One such patient, Patient 5—a Medicare patient seen by Relator Proctor for the prior three weeks, under a reasonable course of treatment—was receiving negative pressure wound therapy and selective debridements. The patient's wound was responding to Relator Proctor's treatment and healing well.

106.    MedCentris' own medical records for Patient 5 stated that his wound demonstrated red, beefy granulated tissue which would not allow for a surgical debridement under the Wound Care LCD. However, Todd Shaffett in his "education," proceeded to instruct Relator Proctor, without any medical explanation, that a surgical debridement should be performed. Shaffett then proceeded to remove only non-living tissue, making this procedure actually a selective debridement, yet he billed Medicare it as if it were *a surgical debridement to muscle level.* Shaffett instructed Relator Proctor that to achieve her needed WVUs, she should repeat this contraindicated procedure and up-code it on a weekly basis on this specific patient as well as other patients under her care.

107.    Shaffett also instructed Relator Proctor what clinical indicators should be viewed as "*queues*" to perform and up-code medically unnecessary surgical debridements in order to increase her WVUs and generate the highest possible amount for the LTAC DRG payment. Shaffett, as President of MedCentris, instructed Relator Proctor that she would increase her WVUs if she kept the following highly encouraged surgical debridement queues in mind:

- If the patient has a Pressure Ulcer, perform a bone level surgical debridement (automatically, every time);

- If the patient has a respiratory diagnosis—for example, if the patient is on a ventilator system as many LTAC patients are—perform a subcutaneous level surgical debridement (again, automatically, every time);

- If the patient has a diabetic foot ulcer, perform a muscle level debridement, (regardless of any other factor, every time);

- If the patient has any type of venous ulcer or leg wound, perform a muscle level debridement (every time).

108.   None of these conditions are determinative or in most cases even relevant in deciding whether to perform a surgical debridement, much less the level of surgical debridement instructed.   Further, basing debridement decisions on these conditions is found nowhere in the Wound Care LCD.   MedCentris' President Todd Shaffett made it abundantly clear to Relator Proctor that patient-specific clinical information and the best interests of the patient were not to be considered and that no medical decision-making was allowed at MedCentris.   She was therefore "highly encouraged" to cut down into the muscle of every patient with a leg wound, every patient with a venous ulcer, and every patient with a diabetic foot ulcer.   She understood that regardless of the patient's condition, she was highly encouraged to cut down into the bone of every patient with a pressure ulcer, no matter how much pain or harm it caused to the patient. She also understood from the example set by Shaffett that if she couldn't bring herself to actually perform such drastic surgical debridements and cause such unnecessary, excruciating pain, then she should nevertheless report it for billing by MedCentris and the Facility Defendants as if she had.

109.   Horrified by these instructions and Shaffett's example, Relator Proctor asked Shaffett to write the instructions down because she couldn't believe what she was hearing, and he flatly refused.   Instead, he warned her to "be careful" not to arouse the suspicion and attention of Medicare auditors, admonishing her that although she should follow the instructions as he had given them she should "be careful" and "be mindful" of the geographic area she was in "because Medicare auditors track billing submissions by zip code."   Accordingly, Shaffett instructed

Relator Proctor to refrain from performing too many of his instructed medically unnecessary debridements in any one zip code so that the company could avoid detection.

110.    Finally, Shaffett explained the importance of continuing to perform repetitive surgical debridements on LTAC patients once the patients were admitted and had already received surgical debridements. He explained that MedCentris had to repeat its performance to provide a promised "value proposition" to DRG reimbursements for MedCentris-contracted LTACs. By performing an initial surgical debridement on the first visit to an LTAC patient, that procedure then factors in to the LTC-DRG formula—fraudulently increasing the facility's DRG by approximately $10,000. However, MedCentris providers must then continue to perform surgical debridements to ensure that the patient stays in the LTAC facility for the full estimated length of stay under the specific, intentionally inflated LTC-DRG code's geometric average length of stay, or the facility would not receive its full DRG payment. In other words, if MedCentris doesn't keep performing no matter the patient's condition, LTACs lose money and MedCentris loses their business. Shaffett specifically and unapologetically instructed that, despite any clinical information to the contrary, each LTAC patient needed to be in the LTAC for 5/6 of the LTC-DRG codes average length of stay in order for the facility to avoid the Short Stay Outlier (SSO) threshold and thus lose promised revenue. Additionally, after this explanation by Shaffett, Relator Proctor joined Shaffett in a conversation with LHC Case Manager Terrell Savoy, who further discussed the financial importance of MedCentris employees making sure that the LTAC did not encounter SSO reductions. Therefore, as explained by its President and ratified by LHC employee Terrell Savoy, MedCentris' obligations under its conspiratorial contracts with LTAC facilities are to initially perform and bill for unnecessary surgical debridements or to bill for such surgical debridements even if they didn't

perform them, then knowingly continue performing and billing unnecessary and/or up-coded procedures in order to garner the full fraudulently inflated DRG revenue for its co-conspirators.

**5. Facility Defendants Pressure and Coerce MedCentris Providers to Perform Unnecessary Services.**

111.    In addition to MedCentris management issuing mandates to perform unnecessary surgical debridements and other services, the Facility Defendants also expect and pressure MedCentris employees to automatically perform surgical debridements on wound care patients.

112.    As soon as a wound patient was scheduled to be admitted to an LTAC facility and before MedCentris had even visited the patient, the LTAC business operations staff, commonly the LTACs marketer, would automatically plan the patient's care as though they were to receive repetitive surgical debridements by MedCentris.  These pre-planned debridements are evident because the LTAC admission documentation—the LTRAXX—show that patients were commonly admitted with debridement-related DRG codes prior to any patient-specific debridement decision being made or the patient even being seen by a MedCentris provider. After the pre-admission debridement decision was made by the LTAC business operations staff, the LTAC case managers would harass MedCentris providers, asking when they would be scheduling debridement procedures, what depth of surgical debridement they would report, and if the MedCentris provider could manipulate the patient's care to keep the patient until the facilities' pre-determined and financially ideal discharge date.  All of these factors are crucial to the LTAC's fraudulent maximization of DRG payments.

113.    In an attempt to understand why she was receiving such extreme pressure to perform surgical debridements, specifically upon a patient's admission to an LTAC, Relator Proctor asked a case manager named Annette at PostAcute in Lafayette why surgical debridements were so important.  Annette's candid reply—which goes to the heart of

MedCentris' conspiratorial contracts with LTAC facilities—was *"every time you do a surgical debridement, you increase our DRG reimbursement by about $10,000 to $15,000."*

114.    As a dedicated medical professional, concerned with providing evidence- and patient-based care, Relator Proctor felt that the Facilities' aggressive overtures interfered with her medical judgment. Relator Proctor repeatedly informed the Facilities' case managers and marketing personnel that she would assess each patient independently. She rejected their attempts to coerce her into making detailed, patient-specific medical decisions without even seeing the patient. The Facility employees were consistently hostile when Relator Proctor rebuffed their attempts to pre-ordain patient care. Despite her attempts to resist the persistent pressure to perform unnecessary and up-coded procedures from the Facility Defendants, Relator Proctor believes this pressure did impact some of her clinical decisions and resulted in falsely inflated government health care payments to Facilities.

115.    Relator Proctor experienced this type of pressure from case managers at Post Acute Specialty Hospital in Lafayette, LA. For instance, Jennifer Landry, the Director of Case Management, and Annette, a case manager, routinely pressured Relator Proctor to prematurely agree to performing surgical debridements and bill deeper, higher-reimbursing debridements.

116.    Relator Proctor received the same pressure from staff at Louisiana Extended Care (LHC) LTAC in Lafayette, LA. On one encounter, Carol Thibodeaux, the Wound Care Team Leader at Louisiana Extended Care, admonished Relator Proctor for performing a lower-level surgical debridement. Specifically, Ms. Thibodeaux scolded Relator Proctor because Relator Proctor performed a lower-level surgical debridement after Relator Proctor's MedCentris predecessor Natalie Tate performed a deeper debridement. This slight variation in patient care, which would follow the path of a healing wound under a legitimate plan of care, was criticized

41

because Ms. Thibodeaux stated that by performing a less extensive surgical debridement, Relator Proctor "reduced LHC's DRG reimbursement and cost the LHC about $5,000." Therefore, under LHC and MedCentris directives, either MedCentris employees were to up-code and bill for the same level of surgical debridement first billed upon a patient's admission (which was itself often medically unnecessary and/or up-coded) throughout the patient's care episode, or a patient could only have their wounds heal and receive a less extensive surgical debridement when the patient's healing also corresponded with LHC and MedCentris maximizing profitability. Further, as demonstrated by Ms. Thibodeaux's admonishment, LHC would enforce its conspiratorial agreement with MedCentris by chastising and intimidating MedCentris providers who were not performing care solely with the goal of maximizing LHC's profitability—regardless of legitimate patient care or resulting patient harm.

### B. MedCentris Internal Auditors Have Identified False Claims Yet MedCentris Continues to Encourage and Mandate Fraud.

117.    In April 2016, MedCentris employee Tim Foret presented an internal audit of MedCentris providers' billing documentation.    Unsurprisingly, the audit discovered the widespread fraud and abuse that permeates MedCentris' patient care.   While only providing a summary of the audit's findings, Mr. Foret's presentation indicated that MedCentris was well aware of the fraud and abuse occurring due to its "aggressive" business model.   Not only did MedCentris not undertake any effort to inform or refund Medicare for the false claims identified in its audit, but Relator Proctor witnessed widespread fraud and abuse continue after the audit was presented.   This continued fraud included her specific tutelage by President Todd Shaffett on how best to submit false claims—roughly one month after the audit was presented.   As such, MedCentris undeniably had knowledge that its practices led to the submission of false claims.

118.    The "Common Audit Findings"  (attached hereto as Exhibit A) were listed as

42

- Lack of medical necessity to support the CPT code

- Non specific ICD-10 codes

- ICD-10 code vs. Assessment

- ICD-10 codes don't match procedure (Bone debridement when ICD10 code mentions no presence of bone)

- No mention of contributing factors and/or attempted management

- No change in POC when wound is stalled or worsening

(Exhibit A at 10).

119.   Foret's presentation of the audit findings continues by describing specific surgical debridements that were not medically necessary because they did not meet the LCD requirements. Specifically, these debridements did not qualify as medically necessary because the wounds were healthy and healing, as they demonstrated bright red granulation. *See* Exhibit A at 6.

120.   The audit also discovered specific debridements that were up-coded because the documentation did not support the depth of debridement that was billed. Specifically, the audit found that the supporting documentation for a specific debridement did not mention the removal of necrotic muscle or even the presence of necrotic muscle, yet was billed as muscle debridement. The audit recommended that the level of debridement be decreased to subcutaneous because the documentation showed that the debridement was falsely up-coded as a muscle debridement. Further, the audit found that this specific debridement did not accurately document the extent of total area debrided, thus incurring an additional false and up-coded charge. *See* Exhibit A at 11.

121.   Finally, the audit noted that the "wound appearance is unchanged from the

43

previous week and it is inconclusive that the procedures are effective." Exhibit A at 11. This finding results in two conclusions regarding MedCentris' fraud: either (1) the surgical muscle-level debridements were not actually being performed, as supported by the lack of documentation in the medical record, or (2) even if some level of surgical debridement was performed—such as the recommended downgraded subcutaneous debridement—the continued, repetitive debridement in spite of the wound not healing from such treatment rendered continued debridement not medically necessary and in fact harmful to the patient and ultimately unbillable.

122.    Consequently, MedCentris' own medical review of its patient records confirmed the exact fraudulent and illegal conduct alleged in this Complaint and identified as fraud by HHS-OIG in its advisory report—systemic performance of medically unnecessary surgical debridements on healthy wounds, despite evidence that the wounds were not healing from such treatment, and pervasive up-coding of surgical debridement procedures.

### C. MedCentris Knowingly Performs Medically Unnecessary Surgical Debridements

123.    Relator Proctor has knowledge of MedCentris routinely performing and billing Medicare for medically unnecessary surgical debridements.

124.    The Novitas Solutions, Inc. LCD L35125 (Wound Care LCD), governs the specific requirements for payment for debridement service and defines wound care as "care of wounds that are refractory to healing or have complicated healing cycles either because of the nature of the wound itself or because of complicating metabolic and/or physiological factors" and specifically covers the CPT service codes billed for different levels of selective and surgical debridement.[23]

125.    Material conditions of payment in the Wound Care LCD, which MedCentris

---

[23]

habitually ignores and violates, include:

(a)    "Medicare coverage for wound care on a continuing basis for a given wound in a given patient is contingent upon evidence documented in the patient's medical record that the wound is improving in response to the wound care being provided."[24]

(b)    "Medicare coverage for professional wound care procedures requires that all applicable adjunctive measures are also employed as part of a comprehensive wound management. Wound care in the absence of such measures, when they are indicated, is not considered to be medically reasonable and necessary."

(c)    "Surgical debridement will not be considered reasonable and necessary when documentation indicates the wound without devitalized, fibrotic, nonviable tissue, infection, necrosis, foreign matter, or if the wound has pink to red granulated tissue. When utilized it is expected that the frequency of debridement will decrease over time."

(d)    Medicare expects that with appropriate care:
- Wound volume or surface dimension should decrease, or
- Wounds optimally demonstrate granulation tissue

(e)    Debridements of the wound(s) if indicated must be performed judiciously and at appropriate intervals. It is expected that, with appropriate care, and no extenuating medical or surgical complications or setbacks, wound volume or surface dimension should decrease overtime. It is also expected the wound care treatment plan is modified in the event that appropriate healing is not achieved.

126.    Furthermore, the utilization guidelines of the Wound Care LCD provide:

"The appropriate interval and frequency of debridement depends on the individual clinical characteristics of the patient and the extent of the wound. The extent and number of services provided should be medically necessary and reasonable based on the documented medical evaluation of the patient's condition, diagnosis, and plan…With the above in mind, only a minority of beneficiaries who undergo debridements for wound care appear to require more than eight total surgical excisional debridement services involving subcutaneous tissue, muscle/fascia, or bone in a 360 day period, (five debridements of which involve removal of muscle/fascia, and/or bone) in order to accomplish the desired objective of the treatment plan of the wound. Only when medical necessity continues to be met and there is documented evidence of clear benefit from the debridements already provided, should debridement services be continued beyond this frequency or time frame."

---

[24] Id.

45

127. The following are examples of government health care patients for whom MedCentris knowingly billed Medicare and/or Medicaid for repetitive unnecessary and/or up-coded surgical debridements:

***Patient J.A.***

128. Patient J.A. is a 39-year-old diabetic with spina bifida causing incomplete paraplegia; he is insured by Medicare and Medicaid. As noted in his medical record, Patient J.A. "is a very unfortunate gentleman" due to his chronic medical conditions and challenges, which include end-stage renal failure, non-compliance with wound care procedures such as smoking cessation, wound off-loading, and refusal of an indwelling Foley catheter. Patient J.A. is the prototypical patient that MedCentris exploits as a "cash cow." The following episode demonstrates the fraud perpetrated by MedCentris and the Facility Defendants, as MedCentris used Patient J.A. to maximize its own revenue by billing Medicare and Medicaid for unnecessary, up-coded, and unperformed surgical debridements. MedCentris also used Patient J.A. to fraudulently boost the revenue of two of the Facility Defendants to commit health care fraud, in blatant disregard of the Wound Care LCD.[25]

129. In 2017, MedCentris was performing bi-weekly surgical debridements on Patient J.A. at Lafayette General Hospital Wound Clinic. On December 4, 2017, for example, Patient J.A. was debrided by MedCentris provider Dr. Rochelle Duplechin. Based on Relator Proctor's knowledge and review of his medical records, Patient J.A.'s wounds and complicating health issues, which implicate a severe risk of infection, made such aggressive debridements medically unnecessary and contraindicated. In fact, they posed a significant and medically unnecessary risk to the patient. Nevertheless, MedCentris referred Patient J.A. for inpatient treatment at Post

---

[25] Although this admission occurred after Relator Proctor left MedCentris, Relator Proctor is knowledgeable of Patient J.A.'s care and medical records because Relator Proctor currently is Patient J.A.'s Primary Care Physician.

Acute LTCH for further debridement. Patient J.A. was admitted to Post Acute in Lafayette, LA on December 11, 2017, ostensibly for further debridement and to treat an infection with antibiotics.

130.    As his current Primary Care Physician, Relator Proctor knows that J.A.'s inpatient admission to Post Acute was wholly unnecessary. However, in its sole pursuit of profit, MedCentris admitted Patient J.A. to Post Acute. By admitting Patient J.A. to Post Acute, MedCentris fulfilled its promise to increase Post Acute's revenue and garnered itself Medicare and Medicaid payments for daily inpatient E/M services while J.A. was admitted to Post Acute.

131.    Patient J.A. was admitted under the following DRG codes of 592 (Skin ulcers with major comorbidities/complications) and 579 (Other skin, subcut. Tiss. & breast proc. With major comorbidities/complications). This DRG code 579 was specifically related to Patient J.A.'s pre-planned in-patient debridement services and resulted in an additional $10,000 to $15,000 Medicare payment to Post Acute.

132.    Upon admission to Post Acute, Patient J.A. presented with two primary wounds. As demonstrated in Patient J.A.'s medical record, these wounds presented with granulated tissue and lacking any necrotic tissue to debride. One of his wounds was actually a callus and noted as such by MedCentris provider Trevor Gates. Billing a callus removal as a surgical debridement is specifically highlighted as medically unnecessary and inappropriate by HHS-OIG in its Surgical Debridement Advisory Report.[26]

133.    Adhering to the "MedCentris Way," MedCentris provider Trevor Gates scheduled Patient J.A. for two sets of weekly surgical debridement on these wounds—despite clear medical

---

[26] Department of Health and Human Services, Office of Inspector General. Medicare Payments For Surgical debridement Services in 2004; OEI-02-05-00390; May 2007; available at: https://oig.hhs.gov/oei/reports/oei-02-05-00390.pdf

evidence that performing or billing for surgical debridements was unnecessary under the Wound Care LCD and specific guidance by HHS-OIG.

134.    Furthermore, the purported surgical debridements that were claimed to be performed during the inpatient episode were up-coded and in fact were not surgical debridements at all because no living tissue was removed.  For several of Patient J.A.'s debridements, the pre-debridement and post-debridement wound measurements were not provided, in violation of medical documentation requirements.    When wound measurements were provided, the measurements did not change at all—demonstrating that Mr. Gates only removed non-living tissue, if anything at all.  Therefore, these procedures were, at most, selective debridements.

135.    Nevertheless, during this 13-day inpatient care episode, MedCentris billed Medicare and Medicaid for multiple muscle level surgical debridements and multiple muscle level additional surface area surgical debridements, purportedly performed on December 12, 2017 and December 18, 2017—despite, at most, having performed only selective debridements. Therefore, MedCentris submitted false claims for payment to Medicare and Medicaid for procedures, that if actually performed would have been medically unnecessary, but were not actually performed and thus up-coded.

136.    Furthermore, admitting Patient J.A. to Post Acute for 13 days and claiming to have provided surgical debridements during this inpatient episode resulted in Post Acute billing Medicare and Medicaid for roughly $40,000-$50,000 in medically unnecessary and inappropriate inpatient care, as well as Post Acute billing Medicare and Medicaid for Facility Fees for each unnecessary and up-coded procedure performed by MedCentris .

137.    Patient J.A. was then discharged from Post Acute on December 24, 2017.  The "hospital course" portion of Patient J.A.'s discharge summary provides that the "patient did really well.  He really had no issues whatsoever."

*Patient 6*

138.    Patient 6 is insured by Medicare and was 83-years-old when admitted to Defendant Louisiana Extended Care in Lafayette, LA.  Beginning with her first visit by MedCentris Provider Natalie Tate, Patient 6's medical record and photos of her wound show that Patient 6's wound bed consisted of pink to red granulated tissue and was devoid of necrotic tissue.  This wound presentation shows an already healing wound.  Therefore, according to the Wound Care LCD and the HHS-OIG report, any surgical debridement billed by MedCentris was not medically reasonable and was, therefore, unnecessary.  However, as instructed by the "MedCentris Way," MedCentris Provider Natalie Tate performed an initial muscle level surgical debridement on Patient 6, in order to maximize the DRG reimbursement for Louisiana Extended Care.  This procedure was billed on January 25, 2016.  Thereafter, MedCentris Provider Natalie Tate proceeded to bill Medicare for seven medically unnecessary bone level surgical debridements in the subsequent seven weeks in a row with corresponding service dates of 2/02/2016, 2/11/2016, 2/17/2016, 2/24/2016, 3/2/2016, 3/9/2016 and 3/15/2016.  In each of the debridement sessions, Ms. Tate billed between seven to ten additional 20 centimeter bone-depth surface area debridement procedures under code 11047.

139.    If these procedures were actually performed as billed, this would mean that for seven weeks in a row, Patient 6, an 83 year-old, had a scalpel or other surgical instrument dig all the way to the bone and have a sample of her bone cut away and removed.  Due to the underlying significance of a Surgical Bone Debridement, this procedure is recommended to be

49

performed in an operating room—with the patient under general anesthesia—and by a surgeon. MedCentris did not put this patient under general anesthesia, but instead used a topical and subcutaneous anesthetic to numb Patient 6's skin while a scalpel purportedly dug into her bone. Topical and subcutaneous anesthetics would not provide much or any pain relief from such an intensive procedure. Further, MedCentris performed these seven procedures, not in an operating room under the care of a surgeon, but at Patient 6's long-term care hospital bed—at the hand of MedCentris-trained NPs. Many wound care professionals, including specialized surgeons, would never legitimately perform this procedure in their entire career. MedCentris performed it seven weeks in a row.

140.    By definition, each of these bone debridements—if actually performed to the depth of a true bone debridement—should have removed the wound tissue to the bone level. According to Patient 6's medical records, however, the wound bed did not deepen to the extent that it would have if these deep debridement procedures were actually performed. Thus, the medical record contradicts the claims for payment which represent that Natalie Tate actually provided the bone level of debridements as billed.

141.    Next, on May 9, 2016, when MedCentris Co-Founder and President Todd Shaffett came to "educate" Relator Proctor, he billed Medicare for another bone level debridement supposedly performed on Patient 6. Relator Proctor witnessed this procedure, however, and observed first-hand that Shaffett did not remove *any* living tissue, much less any tissue to the bone level. Relator Proctor witnessed Shaffett perform a selective debridement, which was up-coded to the level of a bone debridement; this up-coding is represented in MedCentris documentation.    In total, Patient 6 received 12 debridements that were either up-coded,

medically unnecessary, or both—all of which resulted in 20 weeks of inpatient hospitalization at Louisiana Extended Care LTAC.

142.    Due to the repeated unnecessary and up-coded debridements performed by MedCentris, Louisiana Extended Care received a significant fraudulent increase to its DRG billing.  Furthermore, after four weeks under Relator Proctor's care, during which Relator Proctor ignored her specific instruction by Todd Shaffett and instead only provided and billed for reasonable and necessary selective debridements, the patient's wound healed significantly, proving definitively that the purported surgical debridements were unnecessary and contraindicated.

*Patient 8*

143.    Patient 8, a Medicare patient insured through Medicare Novitas, was 73-years-old when admitted to Promise Hospital of Miss Lou, a MedCentris LTAC facility in Vidalia, LA. Patient 8 presented to the MedCentris Wound Clinic with a red beefy wound without any devitalized, fibrotic, nonviable tissue, infection, necrosis or foreign matter—as documented in the medical record by MedCentris.  Therefore, any surgical debridement of this healthy, healing wound would be medically unnecessary pursuant to the Wound Care LCD.  Nevertheless, MedCentris clinician Shanda Richardson proceeded to perform—or at least submitted claims for—nine surgical debridements (four muscle level debridements and five subcutaneous level debridements) on Patient 8 for nine consecutive weeks, from December 6, 2016 to February 7, 2017.  As a result of MedCentris performing nine unnecessary surgical debridements, Patient 8 remained in the Promise Hospital of Miss Lou LTAC and received inpatient care for these nine weeks. MedCentris thus had a captive patient for whom to bill wound care procedures and Promise Hospital of Miss Lou received a higher DRG reimbursement from Medicare.

*Patient 9*

144.    Patient 9 was 61-years-old during his MedCentris episode of care; Medicaid of Louisiana was his primary insurance. Patient 9 presented on his initial visit on November 16, 2016 with a healthy, healing wound as evidenced by a 100 percent red, beefy granulating wound bed with no evidence of devitalized, fibrotic, nonviable tissue, infection, necrosis or foreign matter—as documented by the MedCentris medical record.  Therefore, this wound should have never received a single surgical debridement, as such a procedure would be medically unnecessary under the Wound Care LCD.  Nevertheless, Patient 9 received at least 18 medically unnecessary surgical debridements (all subcutaneous level debridements under CPT code 11042) on this otherwise healthy wound, performed consecutively on a weekly basis by MedCentris provider Shanda Richardson from November 16, 2016 to March 14, 2017.  These procedures were, at best, up-coded or never performed as documented.  At worst, they represent repeated patient abuse in the form of a unnecessary and harmful procedures that retarded the healing process and caused untold pain to Patient 9.  As a result of MedCentris' repeated, medically unnecessary surgical debridements, Patient 9 received outpatient care at Promise Hospital of Miss Lou for at least four months—from November 15, 2016 to March 14, 2017.  Due to MedCentris' repetitive fraudulent debridements and Promise Hospital LTAC's conspiratorial agreement with MedCentris, Promise Hospital received fraudulent increases to its outpatient facility billing.

*Patient C.G.*

145.    The care provided to Patient C.G. under MedCentris' surgically debride first, ask questions later mentality is truly horrifying and demonstrates the harm inflicted on patients by this type of "care."  While Relator Proctor was employed at MedCentris, Patient C.G., a male

patient with cerebral palsy, presented with a large lesion of tissue of cauliflower appearance–
that was an "atypical" or rare and problematic wound extending from his knee to foot. This
wound was actually a long-existing wound stemming from a severe burn Patient C.G. suffered as
a child. Under the MedCentris mandated plan of care of persistent surgical debridement without
examining any other factors, MedCentris provider Dr. Rochelle Duplechin performed surgical
debridements on this wound. Relator Proctor was shocked to learn of this procedure because she
recognized that the lesion was likely cancerous. Performing such a surgical procedure on
cancerous tissue is highly likely to spread the cancer. Unfortunately, Patient C.G. had already
been under MedCentris' care and his wound was continually being debrided and thus worsening
as a result of the unnecessary and contraindicated cutting. Relator Proctor recommended a
biopsy on this wound. The biopsy confirmed it was, in fact, cancerous. But, at this stage, the
continued growth of the cancerous lesion had become so encompassing that Patient C.G. was
forced to have his lower leg amputated.

146.    Relator Proctor was even more distressed to later learn that, prior to MedCentris'
taking over the Wound Clinic at Lafayette General Hospital, Patient C.G.'s wound was well
managed under the care of the Wound Clinic's previous managing physician, Dr. Holden, and
Patient C.G.'s caretaker noted that Dr. Holden took excellent care of Patient C.G.'s leg. When
MedCentris took over the Wound Clinic, however, Patient C.G.'s wound digressed so severely
under the care of constant cutting and attendant spread of the cancer—performed purely for
MedCentris' profitability—that Patient C.G. was forced to have his leg amputated.

147.    Further emphasizing the violation of the Wound Care LCD, not one of these MedCentris
patient examples received an autolytic, enzymatic, biological debridement—each listed as

treatments for such wounds in the LCD. Instead, MedCentris exclusively provided the most lucrative—and the most painful and potentially harmful—surgical debridements.

148.    Through its endemic practice of mandating repetitive, unnecessary, and contraindicated debridement of patients' wounds, MedCentris habitually violates the conditions of payment in this LCD and bills Medicare for non-covered debridement procedures. As exemplified above, MedCentris violates the Medicare conditions of payment for surgical debridements by (1) billing for surgical debridements on healthy, healing wounds; (2) up-coding selective debridements to surgical debridements and up-coding within categories of surgical debridements; (3) performing repetitive surgical debridements without addressing applicable adjunctive measures such as appropriate nutrition, wound off-loading, and compliance with smoking cessation; (4) performing repetitive surgical debridements despite clear evidence that the wound is not improving from such care and in absence of documented evidence of clear benefit from the debridements already provided. For many MedCentris patients, the continued unnecessary cutting into otherwise healthy, healing skin perpetuates the wounds and causes them to worsen, thus providing self-fulfilling false justifications for even more unnecessary debridements and false claims to Medicare and Medicaid by MedCentris and the Facility Defendants.

### D.  MedCentris Routinely Performs Medically Unnecessary and Up-coded Evaluation and Management Visits

149.    MedCentris mandates its clinicians perform medically unnecessary and up-coded E/M visits by requiring clinicians to bill Medicare for a minimum of four E/M visits per week— regardless of the patient's condition or need for E/M visits. These mandatory visits, together with MedCentris' WVU-based pay structure, encourage and require clinicians to spend minimal time with patients and eschew the exercise of legitimate medical decision-making in providing

E/M services, yet MedCentris instructs clinicians to routinely bill Medicare for high- and moderate-level E/M visits.  Furthermore, MedCentris instructs clinicians to bill for E/M services performed in conjunction with debridement procedures in direct violation of Medicare conditions of payment.

### 1.  Medicare Evaluation and Management Guidelines.

150.    Medicare E/M Procedures are categorized, governed, and billed in accordance with CPT codes. The CPT coding system prescribes E/M codes corresponding to different treatment contexts and accounting for varying levels of complexity or severity.

151.    Addressing appropriate E/M billing practices, CMS provides: "Medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code. It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted."[27]

152.    The primary guidelines issued by CMS to determine the appropriate E/M codes are: (1) the 1995 E/M Guidelines; and (2) the 1997 E/M Guidelines, (collectively the "Medicare Guidelines").[28]

153.    The Medicare Guidelines provide that "the descriptors for the levels of E/M services recognize seven components which are used in defining the levels of E/M services; these components are: (1) history; (2) examination; (3) medical decision-making; (4) counseling; (5) coordination of care; (6) nature of presenting problem; and (7) time (spent by the clinician

---

[27] Medicare Claims Processing Manual. Chapter 12 §30.6

[28] Novitas Solutions. Evaluation & Management Center – Jurisdiction H availiable at: https://www.novitas-solutions.com/webcenter/portal/EvaluationandManagement_JH?_adf.ctrl-state=1acx99f6yf_21&_afrLoop=2430637922037872#!%40%40%3F_afrLoop%3D2430637922 037872%26_adf.ctrl-state%3Dmreee5cbw_4 (last visited March 27, 2018)

performing the E/M service)."[29]

154.    Of these aspects of E/M care, the first three—the medical history, examination, and medical decision-making—are the "key components" which dictate the appropriate level and billing of E/M services.[30] Although, if the visits consist predominantly of counseling or coordination of care, time spent with the patient is the key or controlling factor to qualify for a particular level of E/M service.[31]

155.    The primary E/M services and corresponding CPT codes that MedCentris bills are for Initial Evaluations and Subsequent Hospital Care E/M services provided to wound care patients in LTAC inpatient facilities. For initial evaluation E/M visits, codes 99213-99223 are used and escalate in level based on the performance and level of the three key components: (1) medical history, (2) examination, and (3) medical decision-making.  The definitions of these codes also provide recommendations for appropriate coding based on the typical service a specific code is intended to capture.[32]

156.    However, as the majority of MedCentris' E/M services are billed for patients who are seen on a recurring basis—due to MedCentris' practice of performing weekly debridements—subsequent hospital care E/M services (or "established patient" visits) are much more common than initial "new patient" E/M visits.  CPT codes 99231 through 99233 are the codes assigned to established patient E/M visits and escalate in level of complexity, as demonstrated through the medically necessary performance of the three key E/M components: (1) medical history, (2) examination, and (3) medical decision-making.

---

[29] Centers of Medicare & Medicaid Services.  1995 Documentation Guidelines for Evaluation and Management Services at p. 3.
[30] Centers for Medicare and Medicaid; 1995 Documentation Guidelines for Evaluation and Management Services.
[31] Id.
[32] See e.g. CPT Code Set – 99232. American Medical Association. 2017

157.    Each of these codes, in its definition, provides guidance for appropriate performance and use of the code.  For instance, CPT Code 99231, the "low level established patient" code, provides:

> Subsequent hospital care, per day, for the evaluation and management of a patient, which requires at least 2 of these 3 key components: A problem focused interval history; A problem focused examination; Medical decision making that is straightforward or of low complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the patient is stable, recovering or improving. Typically, 15 minutes are spent at the bedside and on the patient's hospital floor or unit.[33]

158.    CPT Code 99232, the "moderate level established patient" code, provides:

> Subsequent hospital care, per day, for the evaluation and management of a patient, which requires at least 2 of these 3 key components: An expanded problem focused interval history; An expanded problem focused examination; Medical decision making of moderate complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. *Usually, the patient is responding inadequately to therapy or has developed a minor complication. Typically, 25 minutes are spent at the bedside and on the patient's hospital floor or unit.(emphasis added).*[34]

159.    CPT Code 99233, the "high level established patient" code, provides:

> Subsequent hospital care, per day, for the evaluation and management of a patient, which requires at least 2 of these 3 key components: A detailed interval history; A detailed examination; Medical decision making of high complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. *Usually, the patient is unstable or has developed a significant complication or a significant new problem.  Typically, 35 minutes are spent at the bedside and on the patient's hospital floor or unit (emphasis added).*[35]

160.    Additionally, Medicare does not allow E/M Services to be billed on the same day as a debridement service unless the "documentation clearly establishes the service as a

---

[33] CPT Code Set – 99231. American Medical Association. 2017
[34] CPT Code Set – 99232. American Medical Association. 2017
[35] CPT Code Set – 99233. American Medical Association. 2017

'separately identifiable service' that was reasonable and necessary, as well *as distinct, from the debridement service(s) provided (emphasis added)*."[36]

### 2. MedCentris' Fraudulent E/M Practices.

161.    The genesis of MedCentris billing Medicare for medically unnecessary and up-coded E/M services is the mandate set by MedCentris' management that all MedCentris patients must receive at least four E/M visits per week.  This mandate flaunts the regulations as well as the concept of individualized patient care.

162.    Upon beginning her employment with MedCentris, Relator Proctor recognized, by witnessing her training preceptor's E/M visits, that the typical MedCentris E/M visit consisted of the practitioner briefly stopping by the patient's inpatient LTAC room and asking how the patient was doing.  A majority of the patients answered that they were doing fine, and thereafter the NP just made brief small talk and moved on to the next patient.  The entire interaction typically took less than five minutes, then the MedCentris provider (who was at this time training Relator Proctor on MedCentris protocol) moved to the next patient and repeated this brief interaction.

163.    Relator Proctor began questioning why these patients needed to be seen on such a regular basis, when the service provided was most often simply a brief, primarily social, conversation lasting a few minutes.  Specifically, Relator Proctor asked COO Ammy Taylor why such cursory E/M visits were being performed and informed Ms. Taylor that she did not believe such E/M services were medically necessary and were therefore not billable under Medicare regulations.  Ms. Taylor responded that Dr. Carpenter, CEO of MedCentris, wanted "his"

---

[36] Local Coverage Determination (LCD): Wound Care (L35125). Available at: https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=35125&ContrId=316&ver=50&ContrVer=1&CntrctrSelected=316*1&Cntrctr=316&s=All&DocType=Active&bc=AggAAAQAAAAA&

patients seen four times per week because they were "so sick."

164.    Later, on April 9, 2016, after Relator Proctor continued questioning the validity of these purported E/M visits, a company-wide meeting was held in which Dr. Shaun Carpenter, the CEO of MedCentris, echoed Ammy Taylor's response and addressed Relator Proctor's questions, proclaiming: "Some of you are questioning the medical necessity of daily Evaluation and Management visits; our patients are sick, and I want them seen four days a week, period."

165.    By this statement, Dr. Carpenter made clear that hundreds, if not thousands, of patients across Louisiana and Mississippi all require four E/M visits per week—no questions asked.  This blanket proclamation has no basis in legitimate medical decision-making and belies any notion of individualized patient care.  Dr. Carpenter, as CEO, obviously had not visited or evaluated, nor did he have specific information about the condition of the overwhelming majority of MedCentris patients, including their individual need for E/M services related to their wound care.   Dr. Carpenter's statement ignores the practical variability of the care needs of MedCentris' patients, many of whose conditions may require that they be seen more than four times per week, many fewer than four times per week.  Plainly, Dr. Carpenter's mandate has no basis—other than a flimsy pretext—in patient medical necessity, and was instead an articulation of MedCentris' financial goals.

166.    The ridiculousness of MedCentris' generic "four E/M visits per week" requirement is further confirmed by the fact that MedCentris' practitioners work only Monday-Friday.  This blanket four E/M visits per week requirement also does not specify which four days of the Monday-Friday work week a patient must be seen.  Therefore, the following care schedule would satisfy MedCentris' protocols (and demonstrates its absurd outcome): one of the "sick" patients requires, and Medicare was billed for, an E/M visit on Monday, Tuesday, Wednesday,

and Thursday, thus achieving the required four visits that week. But since MedCentris has met its financial goal for the week, the "sick" patient would be fine without a visit on Friday, Saturday, or Sunday. In other words, Dr. Carpenter, as CEO of MedCentris, believes without any patient review whatsoever that a patient cannot go but one day during the work week without an E/M visit, but that, so long as it is near the weekend, a patient can go up to three days without an E/M visit. Such a pronouncement strains credulity.

167.    As a result of MedCentris' requiring that its providers perform E/M visits four out of five days in a row, many of these E/M visits are not medically necessary or, as Relator Proctor has observed, are not actually performed in a clinically meaningful sense. Practically, MedCentris' policy caused clinicians to perform and bill Medicare for wholly perfunctory and medically unnecessary E/M visits—as Relator Proctor witnessed her supervisors and co-workers perform.

168.    The mandated but perfunctory E/M visits are either not billable because they are not medically necessary or are not billable because they are not performed. Either way, the "key components" of E/M services are not met. For instance, for a "moderate established patient visit" billed under CPT Code 99232 (by far the most frequent E/M service billed by MedCentris), two of the following three criteria must be met: An expanded problem-focused interval history; an expanded problem-focused examination; medical decision-making of moderate complexity. However, as the typical MedCentris patient is most likely seen several times over the preceding few days, and the same assessment repeatedly performed, MedCentris clinicians cannot genuinely perform an "expanded problem-focused interval history" nor an "expanded problem-focused examination," nor is there any "medical decision-making of moderate complexity."

169.    As a result of these key components being unachievable, MedCentris clinicians simply copy and paste prior visit notes, including required documentation—such as the Chief Complaint, History of Present Illness, Review of Symptoms, Physical Examination, and Medical Decision-Making Components into new E/M service documentation.  Such cloning of medical records has been identified by HHS-OIG as a harbinger of fraud and HHS-OIG is actively seeking to combat the practice.[37]

170.    Another consequence of MedCentris' mandate of four E/M visits within a five-day period is that, not only is it impractical for the substantive "key components" to be legitimately performed repeatedly over that duration, but also the time taken by MedCentris clinicians to perform such superficial E/M services is minimal.  As Relator Proctor witnessed throughout her employment, a typical MedCentris E/M visit is a casual chat with the patient for less than five minutes.  Yet, this interaction is billed—most often—as a moderate established patient visit under CPT Code 99323.  The following are examples of a typical day of falsely-billed MedCentris E/M visits:

a)    On January 31, 2017, MedCentris NP Monique Consoer saw 26 different patients at the MedCentris-contracted facility Promise Hospital in Baton Rouge, LA.  Of these 26 patient visits, Ms. Consoer claimed to perform 21 moderate "subsequent hospital care" E/M visits billed under CPT Code 99232.  The CPT code guidance provides

---

[37] *See* Dept. of Health and Human Services, Office of Inspector General, "CMS and Its Contractors Have Adopted Few Program Integrety Practices to Address Vulnerabilities in EHRs" at 2 (January 2014) *available at* https://oig.hhs.gov/oei/reports/oei-01-11-00571.pdf ("*Copy-Pasting*. Copy-pasting, also known as cloning, enables users to select information from paste information but fail to update it or ensure accuracy, inaccurate information may enter the patient's medical record and inappropriate charges may be billed to patients and third-party health care payers. Furthermore, inappropriate copy-pasting could facilitate attempts to inflate claims and duplicate or create fraudulent claims.

that each of these moderate level E/M visit should typically take 25 minutes. As demonstrated by time-stamped Superbill submissions, however, Ms. Consoer completed all 21 of these visits by 11:07 AM on January 31. Relator Proctor has knowledge that Ms. Consoer started her rounds at approximately 8:30 AM. Thus, it is impossible that Ms. Conseur could have performed 21 moderate "subsequent hospital care" E/M services accurately billed under CPT Code 99232, which should each typically take 25 minutes, or a total of nearly 11 hours, in the 2.5 hours between 8:30 AM and 11:07 AM. Further, Relator Proctor was precepted by Ms. Consoer and has knowledge of her E/M process. To-wit, Relator Proctor witnessed Ms. Consoer speak with each patient for a few moments and copy and paste the vast majority of required progress notes from previous visits. By conducting patient care in this manner, it is not surprising that Ms. Consoer bills Medicare more than any other Adult Health Nurse Practitioner in the State of Louisiana

b) On February 2, 2017, MedCentris NP Kimberly Brown performed 17 moderate level "subsequent hospital care" E/M visits billed under CPT Code 99232. As demonstrated by time-stamped Superbill submissions, Ms. Brown completed all 17 of these visits by 9:22 AM. There is no practical way that Ms. Brown could have completed 17 moderate level subsequent hospital care visits that should take roughly 25 minutes each by 9:22 AM. In order to do so, even with no breaks in between visits and taking no time to move from one patient's room to the other, Ms. Brown would have had to started her shift at approximately 2:00 AM.

c) On December 9, 2015, MedCentris NP Natalie Tate performed 9 moderate level "subsequent hospital care" E/M visits billed under CPT Code 99232. On this date,

Ms. Tate also performed three medically unnecessary surgical debridements in conjunction with three initial evaluations, all billed at "high level" E/M services under code 99223.  As demonstrated by time-stamped Superbill submissions, Ms. Tate completed all nine moderate visits (typically taking 25 minutes each) and three high-level initial visits (typically requiring 70 minutes each), along with surgical debridement procedures, all by 7:16 AM.  Relator Proctor has knowledge of Ms. Tate's schedule and knows that Ms. Tate typically arrived at the LTAC facility at 6:00 AM. Therefore, it is impossible that Ms. Tate could have legitimately performed all services as billed in one hour and sixteen minutes.  By completing all E/M service and debridement responsibilities by 7:16 AM, not only did Ms. Tate not perform legitimate E/M services, but the three high-level initial patient services, billed under CPT Code 99223, could not have been a separately identifiable service that was reasonable and necessary, as well as distinct, from the debridement service(s) provided.

171.    Relator Proctor has knowledge that the overwhelming majority of MedCentris clinicians performed E/M visits in this manner because it is the only way possible to perform their duties as required by MedCentris policies—specifically the blanket proclamation that all patients must receive four E/M visits per week.

172.    MedCentris operates as a consultant in the Facility Defendants' hospitals—only to supposedly provide wound care. As a consultant wound care provider, MedCentris providers work in conjunction with nurses, patients' primary care physicians, medical directors at facilities, and numerous specialists to provide the patients care.  Many of the facilities have specialized wound care nurses on staff.

173.    MedCentris' consultant status implicates several issues. First, and specifically related to E/M services, much of any legitimate portion MedCentris' E/M services consist of counseling or coordination of care. Accordingly, the time spent with the patient is the key or controlling factor to qualify for a particular level of E/M service.[38]  As demonstrated, spending under five minutes with a patient does not qualify as any level of billable E/M service.

174.    Secondly, MedCentris' consultant status begs the question why an outside company is necessary to come in to the facility to exclusively provide a small subset of care. The nurses employed by the hospital, especially those trained in wound care, as well as the physicians and surgeons who have historically served patients' wound care needs as a portion of their comprehensive care duties presumably still know how to care for a patient's wound. In fact, upon coming into new facilities, Relator Proctor had to navigate the sometimes hostile politics of impeding into the hospital providers' traditional purview.

175.    The answer is that MedCentris presents and conducts itself as a money-maker for the facilities. Therefore, MedCentris' proposition is not that MedCentris will provide wound care for the facilities' patients, but that MedCentris will do the "dirty work" of systematic up-coding and performing unnecessary procedures. However, at the losing end of this bargain is the taxpayers' funding the Defendants' coffers and, most tragically, the patients— most often elderly and low-income individuals with significant health problems—being consigned to weeks or months of inpatient hospital stays and being cut open week after week under a plan of care designed to prevent healing, all to maximize the Defendants' profits.

---

[38] Centers for Medicare and Medicaid; 1995 Documentation Guidelines for Evaluation and Management Services.

## COUNT ONE
## PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS UNDER 31 U.S.C. § 3729(a)(1)(A)

176.    Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

177.    By and through the fraudulent schemes described herein, Defendants' knowingly—by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information—presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

(a) Defendants submitted false claims for surgical debridement procedures when Defendants knew the patients did not meet applicable Medicare or Medicaid medical necessity requirements in violation of 42 U.S.C. §1395y;

(b) Defendants submitted false claims for surgical debridement procedures that were falsely inflated or "up-coded" because the false claims represented that more substantial and higher cost procedures were performed, when in fact lesser, lower-cost, procedures were actually performed.

(c) Defendants submitted false claims for Evaluation and Management services that were medically unnecessary in violation of 42 U.S.C. §1395y.

(d) Defendants submitted false claims for Evaluation and Management services that were falsely inflated or "up-coded" because the false claims represented that more substantial and higher-cost services were performed, when in fact lesser, lower-cost, services were actually performed.

(e) Defendants submitted false claims for falsely inflated inpatient and outpatient hospital care attendant to performance of medically unnecessary and "up-coded" wound care.

(f) The United States paid the false claims described herein and summarized above.

177.    Defendants' fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States and fraudulent billing of the United States through Medicare and/or Medicaid.

178.    Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in her favor on behalf of the United States, and against Defendants, jointly and severely, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT TWO
## MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. § 3729(a)(1)(B)

179.    Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

180.    By and through the fraudulent schemes described herein, Defendants knowingly—by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information—made, used, or caused to be made or used, false records or

statement material to a false or fraudulent claim or to get a false or false claim paid or approved by the United States, to wit: Defendants created or used false billing submissions; false inpatient admission notes; and copied and forged patient documentation and other false records to support fraudulent billing to the United States, all in violation of 42 U.S.C. §1395y and the governing Medicare conditions of payment.

181.    The false records or statements described herein were material to the false claims submitted or caused to be submitted, by Defendants to the United States.

182.    In reliance upon Defendants' false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

183.    Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendants and others by the United States for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in her favor on behalf of the United States and against Defendants, jointly and severely, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest and such other, different or further relief to which Relator may be entitled.

## COUNT THREE
## REVERSE FALSE CLAIMS UNDER 31 U.S.C. §3729(a)(1)(G)

184.    Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

185.    By and through the fraudulent schemes describe herein, Defendants knowingly—by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information—made, used or caused to be made or used, false records or statements material

to an obligation to pay or transmit money or property to the United States, or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:

    (a) Defendants knew they received substantial amounts of money for wound care services that were medically unnecessary, up-coded, and not performed in compliance with Medicare conditions of payment, yet Defendants took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

    (b) Defendants knew they received substantial amounts of money for inpatient and outpatient care that was falsely and strategically inflated because of Defendants' persistent performance of medically unnecessary and up-coded procedures, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payment and instead retained the funds and continued to bill the United States.

WHEREFORE, Relator demands judgment in her favor on behalf of the United States and against Defendants, jointly and severely, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest and such other, different or further relief to which Relator may be entitled.

### COUNT FOUR
### CONSPIRACY UNDER 31 U.S.C. § 3729(a)(1)(C)

186.    Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

187.    Defendants knowingly presented, caused to be presented, false or fraudulent claims to United States for payment or approval to wit:

(a) Defendants billed Medicare for wound care services that were medically unnecessary, up-coded, and not performed in conformance with Medicare conditions of payment;

(b) Defendants billed Medicare and Medicaid for patient care that was falsely and strategically inflated because of Defendants' persistent performance of medically unnecessary and up-coded procedures.

188.    The United States paid Defendant for such false claims.

189.    Defendants, in concert with each other, agreed to create a self-perpetuating mechanism by which Defendants Wound Care Associates/MedCentris performed medically unnecessary and up-coded wound care procedures to allow the Facility Defendants to bill for falsely inflated care, which in turn gave Defendants Wound Care Associates/MedCentris a captive patient population for whom to continually bill medically unnecessary and up-coded wound care.

190.    Defendants acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare or Medicaid.

191.    Defendants' fraudulent actions, in concert with each other, have resulted in damage to the United States equal to the amount paid by the United States to Defendants as a result of the Defendants' fraudulent claims.

WHEREFORE, Relator demands judgment in her favor on behalf of the United States and against Defendants, jointly and severely, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729,

attorneys' fees, costs, interest and such other, different or further relief to which Relator may be entitled.

## COUNT FIVE
## PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS UNDER LOUISIANA REVISED STATUTES § 46:438.3(A)

192.    Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

193.    By and through the conduct described, *supra*, Defendants knowingly presented or caused to presented a false or fraudulent claim;

194.    By and through the fraudulent schemes described herein, Defendants' knowingly—by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information—presented or caused to be presented false or fraudulent claims to the Louisiana Medicaid Program for payment or approval, to wit:

(a) Defendants submitted false claims for surgical debridement procedures claimed to be performed when Defendants knew the patients did not meet Medicare or Medicaid medical necessity requirements to receive surgical debridements.

(b) Defendants submitted false claims for surgical debridement procedures that were falsely inflated or "up-coded" because the false claims represented that more substantial and higher cost procedures were performed, when in fact lesser, lower-cost, procedures were actually performed.

(c) Defendants submitted false claims for Evaluation and Management services that were medically unnecessary.

70

(d) Defendants submitted false claims for Evaluation and Management services that were falsely inflated or "up-coded" because the false claims represented that more substantial and higher cost services were performed, when in fact lesser, lower-cost, services were actually performed.

(e) Defendants submitted false claims for falsely inflated patient care based on the performance of medically unnecessary and up-coded wound care.

(f) The Louisiana Medicaid Program paid the false claims described herein and summarized above.

195.    Defendants' fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the Louisiana Medicaid Program and fraudulent billing of the Louisiana Medicaid Program.

196.    Defendants' fraudulent actions described herein have resulted in damage to the State of Louisiana equal to the amount paid or reimbursed to Defendants and others by the Louisiana Medicaid Program for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in her favor on behalf of the State of Louisiana, and against Defendants, jointly and severely, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by LSA-R.S. 46:438.6, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT SIX
## MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER LOUISIANA REVISED STATUTES § 46:438.3(B)

197.    Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

198.    By and through the fraudulent schemes described herein, Defendants knowingly—by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information—made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or false claim paid or approved by the Louisiana Medicaid Program, to wit: Defendants created or used false billing submissions; false admission notes; and copied and forged patient documentation and other false records to support fraudulent billing to the Louisiana Medicaid Program, all in violation of the governing Medicaid conditions of payment.

199.    The false records or statements described herein were material to the false claims submitted or caused to be submitted, by Defendants to the Louisiana Medicaid Program.

200.    In reliance upon Defendants' false statements and records, the Louisiana Medicaid Program paid false claims that it would not have paid if not for those false statements and records.

201.    Defendants' fraudulent actions described herein have resulted in damage to the State of Louisiana equal to the amount paid or reimbursed to Defendants and others by the State of Louisiana for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in her favor on behalf of the State of Louisiana and against Defendants, jointly and severely, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by LSA-R.S. 46:438.6, attorneys' fees, costs, interest and such other, different or further relief to which Relator may be entitled.

**COUNT SEVEN**
**REVERSE FALSE CLAIMS UNDER LOUISIANA REVISED STATUTES § 46:438.3(C)**

202.    Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

203.    By and through the fraudulent schemes describe herein, Defendants knowingly—by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information—made, used or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Louisiana Medicaid Program, or knowingly and improperly avoided an obligation to pay or transmit money or property to the Louisiana Medicaid Program, to wit:

(a) Defendants knew they received substantial amounts of money for wound care services that were medically unnecessary, up-coded and not performed in conformance with Medicaid conditions of payment, yet Defendants took no action to satisfy its obligations to the Louisiana Medicaid Program to repay or refund those payments and instead retained the funds and continued to bill the Louisiana Medicaid Program;

(b) Defendants knew they received substantial amounts of money for patient care that was falsely and strategically inflated because of Defendants' persistent performance of medically unnecessary and up-coded wound care procedures, yet Defendants took no action to satisfy its obligations to the Louisiana Medicaid Program to repay or refund those payments and instead retained the funds and continued to bill the Louisiana Medicaid Program.

WHEREFORE, Relator demands judgment in her favor on behalf of the State of

73

Louisiana and against Defendants, jointly and severely, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by LSA-R.S. 46:438.6, attorneys' fees, costs, interest and such other, different or further relief to which Relator may be entitled.

## COUNT EIGHT
## CONSPIRACY UNDER LOUISIANA REVISED STATUTES § 46:438.3(D)

204.    Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

205.    Defendants knowingly presented, caused to be presented, false or fraudulent claims to the Louisiana Medicaid Program for payment or approval to wit:

(a) Defendants billed the Louisiana Medicaid Program for wound care services that were medically unnecessary, up-coded and not performed in conformance with Medicaid conditions of payment;

(b) Defendants billed the Louisiana Medicaid Program for patient care that was falsely and strategically inflated because of Defendants' persistent performance of medically unnecessary surgical procedures.

(c) The Louisiana Medicaid Program paid Defendant for such false claims.

206.    Defendants, in concert with each other, agreed to create a self-perpetuating mechanism by which Defendants Wound Care Associates/MedCentris performed medically unnecessary and up-coded wound care to allow the Facility Defendants to bill for falsely inflated care which in turn gave Defendants Wound Care Associates/MedCentris a captive patient population for whom to continually bill performed medically unnecessary and up-coded wound care.

74

207.    Defendants acted, by and through the conduct described *supra*, with the intent to defraud the Louisiana Medicaid Program by submitting false claims for payment to the Louisiana Medicaid Program.

208.    Defendants' fraudulent actions, in concert with each other, have resulted in damage to the State of Louisiana equal to the amount paid by the State of Louisiana to Defendants as a result of the Defendants' fraudulent claims.

WHEREFORE, Relator demands judgment in her favor on behalf of the State of Louisiana and against Defendants, jointly and severely, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by LSA-R.S. 46:438.6, attorneys' fees, costs, interest and such other, different or further relief to which Relator may be entitled.

**COUNT NINE**
**SUBMISSION OF CLAIMS FOR SERVICES WHICH WERE MEDICALLY**
**UNNECESSARY OR WHICH WERE OF SUBSTANDARD QUALITY OR QUANTITY**
**UNDER LOUISIANA REVISED STATUTES § 46:438.3(E)(1)**

209.    Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

210.    Defendants knowingly presented, caused to be presented, false or fraudulent claims to the Louisiana Medicaid Program for payment or approval to wit:

(a) Defendants billed the Louisiana Medicaid Program for wound care services that were medically unnecessary, up-coded, performed in excessive quantity and substandard quality and not performed in conformance with Medicaid conditions of payment;

(b) Defendants billed the Louisiana Medicaid Program for patient care that was falsely and strategically inflated and in excessive quantity and substandard quality because of Defendants' persistent performance of medically unnecessary and up-coded wound

care procedures.

(c) The Louisiana Medicaid Program paid Defendant for such false claims.

WHEREFORE, Relator demands judgment in her favor on behalf of the State of Louisiana and against Defendants, jointly and severely, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by LSA-R.S. 46:438.6, attorneys' fees, costs, interest and such other, different or further relief to which Relator may be entitled.

<strong>RELATOR DEMANDS A TRIAL BY STRUCK JURY</strong>

Respectfully submitted,

*/s/ Laurence "Lon" D. LeSueur Jr.*
Stephen L. Miles (LA Bar No. 31263)
Laurence D. LeSueur (LA Bar No. 35206)
**BARRASSO USDIN KUPPERMAN**
 **FREEMAN & SARVER, LLC**
909 Poydras Street, 24th Floor
New Orleans, Louisiana 70112
smiles@barrassousdin.com
llesueur@barrasousdin.com
Tel:  (504) 589-9700
Fax: (504) 589-9701

**FROHSIN & BARGER, LLC**
James F. Barger, Jr. *(pro hac vice pending)*
Alabama Bar No. ASB-2336-M76B
Georgia Bar No. 843064
Tel: 205.933.4006
Fax: 205.933.4008
jim@frohsinbarger.com

*Attorneys for Relator Brenda Proctor*