# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA and MEDICAL ASSISTANCE PROGRAMS *Ex Rel.* BRENDA PROCTOR | CIVIL ACTION NO. 2:18-cv-4234 |
| | JUDGE: CARL J. BARBIER |
| VERSUS | |
| WOUND CARE MANAGEMENT, LLC d.b.a. MEDCENTRIS, et al. | MAGISTRATE JUDGE: EVA J. DOSSIER |

## MEMORANDUM IN SUPPORT OF MEDCENTRIS DEFENDANTS' MOTION TO DISMISS RELATOR'S FIRST AMENDED COMPLAINT

Defendants Wound Care Management, LLC d/b/a MedCentris, Wound Care Associates, L.L.C., and MedCentris Specialty Group (the "MedCentris Defendants") submit this memorandum in support of their motion to dismiss this *qui tam* action and Relator Brenda Proctor's First Amended Complaint (the "FAC" or "Complaint") (Doc. 9) pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) for failure to state a claim.[1]

## INTRODUCTION

All the treatment decisions at issue in this Complaint have already been scrutinized and endorsed through multiple audits by the Medicare Administrative Contractors ("MACs"). Now, Plaintiff-Relator Brenda Proctor ("Relator"), a Nurse Practitioner who personally disagrees with state-of-the-art debridements, challenges the clinical judgment exercised by highly trained wound

---

[1] In a separate motion filed today, MedCentris Defendants challenge the constitutionality of this qui tam action in their Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1) filed jointly with Defendants Post Acute Medical, LLC, Post Acute Specialty Hospital of Lafayette, LLC, PAM II of Covington, LLC, and Post Acute Medical at Hammond, LLC, Professional Rehabilitation Hospital, L.L.C. f/k/a Promise Hospital of Miss Lou d/b/a Riverbridge Specialty Hospital, LHC Group, Inc. and LHCG XII, LLC d/b/a Louisiana Extended Care Hospital of Lafayette.

#103986606v3

care physicians and specialists in one of the largest and most successful specialty wound care practices across the United States.

MedCentris' patients are chronically ill and oftentimes elderly individuals with severe wounds and bedsores that have not healed with topical ointments and require more advanced care as determined by their treating physicians. As a result of the seriousness of their wounds, the patients are typically referred to Long Term Acute Care centers to allow them to be followed over a period of weeks to address their wounds rather than simply putting a band aid on them.

The leaders and specialists employed by MedCentris Defendants essentially created the modern standard of wound care. At the time of this *qui tam* action, MedCentris Defendants were ahead of the healthcare industry. MedCentris Defendants' approach was supported by peer reviewed medical literature and is now recognized as the standard of care. The Relator's philosophical objections do not make MedCentris Defendants' pioneering use of debridements, skin substitutes, hyperbaric oxygen therapy, and Evaluation and Maintenance ("E/M") visits fraudulent. What Relator derides as the "MedCentris Way" is simply good medicine, carefully documented, and administered in compliance with the government's regulations.

Ultimately, this lawsuit should not survive any Motion to Dismiss because Relator fails to plead plausible or particularized allegations to support her various claims underpinned by the False Claims Act ("FCA"). After years of investigating the allegations at issue, the United States declined to intervene. There is good reason for this: Relator's Complaint is built on conjecture and speculation, which is not inherently inferential. The Complaint attaches no medical records, and cites no billing data, claims submissions, or documentation of any kind to support the sweeping accusations it lobs at the Defendants. At the same time, the Relator attempts to place her own clinical judgments on a pedestal and couch MedCentris Defendants' opposing opinions as

2

fraudulent. Relator's cherry-picked reading of patients' medical records cannot overcome the fact she fails to plead the essential elements of her causes of action, omits factual support, and relies on conclusory allegations and generalizations of MedCentris' working environment in place of the required particularized allegations. Accordingly, Defendants respectfully request that the Court dismiss Relator's Complaint in its entirety with prejudice.

## **BACKGROUND**

I.    **Relator's Allegations in the Complaint.**

A.    **Debridements.**

In the Complaint, Relator argues that MedCentris Defendants habitually violated the applicable standard of care for wound care and includes patient examples of MedCentris Defendants doing so and/or up-coding the level of debridement based on her review of the patients' medical records. (*See* FAC, ¶¶ 136-148).

Relator proposes that Patient J.A. represents how the MedCentris Defendants and their co-defendants perpetrated fraud by billing Medicare and Medicaid for "unnecessary, up-coded, and unperformed surgical debridements." (FAC, ¶ 141). Relator argues that Patient J.A. underwent surgical debridements "purportedly performed on December 12, 2017 and December 18, 2017." (FAC, ¶ 148). Relator concludes that "MedCentris submitted false claims for payment to Medicare and Medicaid for [these] procedures, that if actually performed would have been medically unnecessary, but were not actually performed and thus up-coded." (*Id.*) Relator argues that these Medicare and Medicaid claims were false, medically unnecessary, up-coded (or somehow "unperformed") based on Relator's review of Patient J.A.'s medical records and her "knowledge" as either a medical professional or the patient's primary care physician. (*See* FAC, ¶¶ 141-143).

3

Relator then alleges that Patient 6 "received 12 debridements that were either up-coded, medically unnecessary, or both—all of which resulted in 20 weeks of inpatient hospitalization at Louisiana Extended Care LTAC." (*See* FAC, ¶¶ 154). On January 25, 2016, Relator alleges that Patient 6 underwent a surgical debridement that was medically unnecessary and that MedCentris proceeded to bill Medicare for seven medically unnecessary bone level surgical debridements in the subsequent seven weeks in a row, all purportedly based on Realtor's review of patient's medical record and photos. (*See* FAC, ¶ 151). And on May 9, 2016, Relator alleges that she witnessed "MedCentris Co-Founder and President Todd Shaffett … bill[] Medicare for another bone level debridement supposedly performed on Patient 6" but that Shaffett performed a selective debridement, which was up-coded to the level of a bone debridement, and was represented in MedCentris documentation. (*See* FAC, ¶ 154).

According to Relator, Patient 8's medical records showed she was admitted to Promise Hospital of Miss Lou, a MedCentris LTAC facility in Vidalia, Louisiana and that MedCentris clinician Shanda Richardson proceeded to perform nine unnecessary surgical debridements on Patient 8 for nine consecutive weeks, from December 6, 2016 to February 7, 2017. (*See* FAC, ¶ 156). Next, Patient 9 allegedly received at least 18 medically unnecessary surgical debridements, performed consecutively on a weekly basis by MedCentris provider Shanda Richardson and received outpatient care at Promise Hospital of Miss Lou from November 16, 2016 to March 14, 2017. (*See* FAC, ¶ 157). Finally, while Relator was employed at MedCentris, Relator alleges that MedCentris provider Dr. Rochelle Duplechin performed medically unnecessary surgical debridements on Patient C.G.'s wound. (*See* FAC, ¶ 158).

4

B.    **Skin Substitutes.**

Relator argues that MedCentris Defendants also habitually violated the applicable standard of care for skin substitutes in the following three patient examples and billed Medicare and/or Medicaid for advanced skim substitute products. (FAC, ¶¶ 162-169).

> On February 2, 2017, Patient 1 received, and MedCentris billed for, twelve units of PuraPly AM skin substitute and the application of the skin substitute, despite documentation on January 26, 2017 stating that the wound was improving.

> On February 2, 2017, Patient 3 received, and MedCentris billed Medicare for 54 units of PuraPly AM skin substitute while the patient was exhibiting an active infection and Patient 3 was documented as not being compliant with conservative compression therapy. One week later, on February 9, 2017, Patient 3 received, and MedCentris billed Medicare for 54 units of PuraPly AM skin substitute while the patient was still exhibiting an active infection to the wound and still not documented as being compliant with conservative compression therapy.

> On January 12, 2017 and January 19, 2017, Patient 17 received and MedCentris billed four units of PuraPly AM skin substitute and the application of skin substitutes, despite the patient having recently been hospitalized for osteomyelitis and the patient's diabetes being uncontrolled.

(FAC, ¶ 169).

C.    **Hyperbaric Oxygen Therapy.**

Relator also argues that MedCentris Defendants habitually violated the applicable standard of care for hyperbaric oxygen therapy, relying on one example and no documentation for its argument that Defendants performed and billed government healthcare programs for unnecessary and non-reimbursable hyperbaric oxygen therapy. (FAC, ¶¶ 170-178).

D.    **Evaluation and Maintenance Visits.**

Finally, Relator alleges that many of MedCentris Defendants' E/M visits "are not medically necessary or, as Relator has observed, are not actually performed in a clinically meaningful sense"

5

but "are billed—most often—as a moderate established patient visit under CPT Code 99323." (FAC, ¶¶ 198-207). Relator's claims are simply conjecture and ignore the fact that MedCentris wound care specialists not only meet with the patient, but review their charts, chart the results of their own visit, oftentimes confer with the patients' other care providers and primary care physicians. Relator claims to have knowledge that on January 31, 2017, MedCentris nurse practitioner ("NP") Monique Consoer could not have completed her 21 moderate "subsequent hospital care" E/M visits and that Relator witnessed "Ms. Consoer speak with each patient for a few moments and copy and paste the vast majority of required progress notes from previous visits." (*See* FAC, ¶207(a)). Relator also claims that based on Superbill submissions MedCentris NP Kimberly Brown did not perform 17 moderate level subsequent hospital care E/M visits on February 2, 2017. (*See* FAC, ¶ 207(b)). Finally, Relator claims that on December 9, 2015, MedCentris NP Natalie Tate could not have performed her 9 moderate level "subsequent hospital care" E/M visits that day along with "three medically unnecessary surgical debridements in conjunction with three initial evaluations," based on unattached Superbill submissions and her own personal knowledge of Ms. Tate's typical schedule. (*See* FAC, ¶207(c)).

## II.    Procedural History

Relator initiated this action with the filing of her original complaint over seven years ago, on April 26, 2018 (Doc. 1). Since that time, Relator amended her complaint on November 14, 2018, with the filing of her Amended Complaint (Doc. 9) ("FAC" or "Complaint). The Complaint alleges that all the Defendants violated the FCA by, among other things, billing (or causing claims to be submitted to) federal and state government health care programs for medically unnecessary procedures, falsely upcoding certain procedures, and entering agreements that, according to Relator, violated federal and/or state law. Following more than six years of investigating, the

6

government filed its Notice of Election to Decline Intervention in the case on December 5, 2024 (Doc. 37).

This entire *qui tam* action must be dismissed because Relator fails to plead plausible or particularized allegations to support her various claims. Accordingly, MedCentris Defendants respectfully request that the Court dismiss Relator's Complaint in its entirety with prejudice.

## LAW

### I.    Rule 12(b)(6) Pleading Standard

To survive a motion to dismiss under Federal Rules of Civil Procedure 8 and 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (reflecting the threshold requirement of Rule 8(a)(2) that the "'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'"). The plaintiff's allegations must allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged"; it is not enough for a complaint to raise only the "possibility" that the defendant acted unlawfully. *Id.* Additionally, a claim is not plausible if there is an "obvious alternative explanation." *Twombly*, 550 U.S. at 567. Although this Court must view the allegations in the light most favorable to the Relator, it should not accept legal conclusions couched as facts, "conclusory allegations," or "unwarranted deductions of fact." *United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 379 (5th Cir. 2003) (quoting *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992). Nor should the Court accept allegations that are contradicted by documents referenced in the Complaint. *See United States ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487, 494 (S.D. Tex. 2003), *aff'd*, 111 F. App'x 296 (5th Cir. 2004).

#103986606v3

## II.    Rule 9(b) Heightened Pleading Standard

In addition to meeting the requirements of Federal Rules of Civil Procedure 8 and 12(b)(6), "a complaint filed under the [FCA] must meet the heightened pleading standard of Rule 9(b)," *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (citation omitted). This requires the Relator to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). In order to plead fraud with particularity, "a plaintiff must state the factual basis for the fraudulent claim with particularity and cannot rely on speculation or conclusional allegations." *United States ex rel. Rafizadeh v. Continental Common, Inc.*, 553 F.3d 869, 873 (5th Cir. 2008). In general, such a statement should include the "time, place, and contents of the false representation[], as well as the identity of the person making the misrepresentation and what that person obtained thereby." *Grubbs*, 565 F.3d at 186 (quoting *United States ex rel. Russell v. Epic Healthcare Mgmt. Group.*, 193 F.3d 304, 308 (5th Cir. 1999)); *see also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997). "This higher standard of pleading 'stems from the obvious concerns that general, unsubstantiated charges of fraud can do damage to a defendant's reputation.'" *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 903 F. Supp. 2d 473, 483 (E.D. Tex. 2011) (quoting *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992)). If a realtor cannot allege the details of an *actually submitted false claim*, they "may nevertheless survive by alleging *particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted*." *Grubbs*, 565 F.3d at 190 (emphasis added). However, the Fifth Circuit "appl[ies] Rule 9(b) to fraud complaints with 'bite' and 'without apology.'" *Id.* at 185 (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997)).

8

### III.    False Claims Act

The FCA imposes liability on individuals who defraud the government by submitting "a false or fraudulent claim for payment or approval" of government funds or make a "false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B). To state a claim under the FCA, the government must allege that "(1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *See United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467 (5th Cir. 2009) (citation omitted); *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475 (5th Cir. 2012). "The [FCA] is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016) (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008)). The FCA "attaches liability not to the underlying fraudulent activity, but to the [false] claim for payment." *United States ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 765 (S.D. Tex. 2010). Therefore, in order to adequately plead a FCA claim, Relator must particularly allege that actual false claims were submitted or allege a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted. *See Grubbs*, 565 F.3d at 190-91.

### <u>ANALYSIS</u>

The Court should dismiss all 12 counts asserted by Relator against MedCentris Defendants in the Complaint for the following reasons:

1. Counts 1, 2, 7, 8, 11, and 12 should be dismissed because Realtor fails to plead an actually submitted, false claim because:

a. Relator alleges conflicting and ambiguous theories of liability based on medical necessity and/or up-coding;

b. Relator does not plead with particularity the details of any *actually submitted* claims;

c. Relator does not plead any actually submitted *false* claims;

d. Realtor does not allege particular details of a *scheme* to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted; and

e. Relator does not plead with particularity that MedCentris Defendants submitted false claims or engaged in a scheme to submit false claims with the required *scienter*;

2. Counts 3 and 9 should be dismissed because Realtor fails to adequately allege reverse false claims by MedCentris Defendants;

3. Counts 4 and 10 should be dismissed because Realtor fails to adequately plead a conspiracy by Defendants; and

4. Counts 5 and 6 should be dismissed because Relator fails to adequately plead false claims based on the Anti-Kickback Statute or Stark Law.

**I.    Counts 1, 2, 7, 8, 11, and 12 Should Be Dismissed Because Realtor Fails to Plead an Actually Submitted, False Claim.**

First, Relator's allegations do not state a plausible claim for fraud against any Defendant under Rule 8, much less under the more stringent Rule 9(b) standard. Therefore, Relator's Complaint should be dismissed pursuant to Rule 12(b)(6).

In Counts 1 and 7, Relator alleges that Defendants presented or caused to be presented false or fraudulent claims to the United States and the Louisiana Medicaid Program for payment or

approval under 31 U.S.C. $ 3729(A)(1)(A) and Louisiana Revised Statutes § 46:438.3(A), respectively. (*See* FAC, ¶¶ 215-216; ¶¶ 242-246). This statute provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval is liable to the United States Government for a civil penalty. 31 U.S.C. § 3729(a)(1)(A). Louisiana Revised Statutes § 46:438.3(A) provides that "[n]o person shall knowingly present or cause to be presented a false or fraudulent claim." Additionally, in Counts 11 and 12, Relator alleges Defendants presented or submitted false or fraudulent claims to the Louisiana Medicaid Program for payment or approval in violation of Louisiana Revised Statutes § 46:438.3(E)(1) and La R.S. 46:438.2, respectively. (*See* FAC, ¶¶ 260-264).

As part of these submissions, Relator alleges in Count 2 and 8 that Defendants made, used, or caused to be made or used, false records or statement material to a false or fraudulent claim or to get a false or false claim paid or approved by the United States and the Louisiana Medicaid Program in violation of 31 U.S.C. § 3729(A)(1)(B) and Louisiana Revised Statutes § 46:438.3(B), respectively. (*See* FAC, ¶¶ 219-223; ¶¶ 247-251).

To survive dismissal, the Fifth Circuit requires an FCA complaint to allege either "the details of an actually submitted false claim" or "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190-91. Relator does not satisfy either test.

### A. Relator Articulates Conflicting and Ambiguous Theories of Liability Based on Medical Necessity and/or Up-Coding.

It is axiomatic that the Complaint must provide MedCentris Defendants with sufficient notice of the acts of which the relator complains. *See Grubbs*, 565 F.3d at 190-91; *see also Christopher v. Harbury*, 536 U.S. 403, 416 (2002) (elements of a plaintiff's claim(s) "must be addressed by allegations in the complaint sufficient to give fair notice to a defendant"). Rule 9(b)'s

11

objectives are to ensure the complaint provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims then attempting to discover unknown wrongs. *See id.* (quoting *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994)).

Yet here, Relator's allegations are so incoherent and conflicting that they fail to put MedCentris Defendants on notice of what they supposedly did wrong. It is impossible to discern from the Complaint what conduct Relator believes occurred.

Relator fails to plead with particularity any false claims related to surgical debridement procedures. The Complaint fails to decide whether MedCentris Defendants are guilty of unnecessary debridements or instead are guilty of up-coding presumably medically necessary debridements. Relator seems to simultaneously assert these inherently contradictory positions, all while not alleging even the barest of underlying factual support.

For example, Relator alleges that procedures on Patient J.A. Relator alleges that MedCentris Defendants' debridement procedures "***were, at most***, selective debridements," not surgical debridements, but alleges that *if* any surgical debridements *were* "***actually performed***", they would "have been medically unnecessary", but then vacillates back to alleging that surgical debridements "***were not actually performed***". (*See* FAC, ¶¶ 141-150) (emphasis added). Additionally, Additionally, regarding MedCentris Defendants' alleged treatment of Patient 6, Relator alleges Patient 6 underwent surgical debridements but later questions "[i]f these procedures were actually performed as billed", and finishes her allegation by alleging that "Patient 6 received 12 debridements that ***were either up-coded, medically unnecessary, or both***". (*See* FAC, ¶¶ 151-155) (emphasis added). Similarly, Relator alleges that "Patient 9 received at least 18 medically unnecessary surgical debridements (all subcutaneous level debridements under CPT

12

code 11042)" but then alleges "[t]hese procedures ***were, at best, up-coded or never performed as documented. At worst, they represent repeated patient abuse*** in the form of unnecessary and harmful procedures[.]" (FAC, ¶ 157) (emphasis added).

Is it alleged that MedCentris Defendants performed a medically necessary procedure but up-coded it, or that they performed a medically unnecessary procedure? Throughout Relator's complaint, it is unclear. Relator has not made up her mind what MedCentris Defendants are allegedly guilty of as her representative examples of the larger alleged scheme cannot decide whether MedCentris faces liability for unnecessary treatment or up-coding. These pleading failures are not mere technicalities: Rule 9(b) provides an important protection for defendants against such vague allegations of wrongdoing. In essence, Relator's pleading is merely an unfounded legal conclusion hopelessly in search of an allegation. Because the Complaint fails to give MedCentris notice of the fraud it allegedly committed, the Relator's entire Complaint should be dismissed.

### B.    Relator does not plead with particularity the details of any _actually submitted_ false _claims_.

The Complaint fails to plead factual allegations of an actual submission of a false claim. "[C]laims brought under the FCA must comply with the particularity requirements of Rule 9(b)", which "requires, at a minimum, 'that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010) (citing *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997); *United States ex rel. Rafizadeh v. Cont'l Common, Inc.*, 553 F.3d 869, 872-73 (5th Cir. 2008) ("Because the linchpin of an FCA claim is a false claim, the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby must be stated in a complaint alleging violation of the FCA in order to satisfy Rule 9(b).")) Although "there is no `presentment'

requirement for a § 3729(a)(1)(B) claim[,] . . . the plaintiff must plead a connection between the alleged fraud[ulent statement] and an actual claim made payable to the government." *United States ex rel. Benaissa v. Trinity Health*, 963 F.3d 733, 741 (8th Cir. 2020) (internal quotation marks and citation omitted). A plaintiff necessarily must allege with particularity the submission of a claim for payment to the government. *See id.* at 741-42.

Without reference to an actual bill or claim, Relator refers to various patients and various purported dates of service, claim dates, billing codes, and ranges of dollars, Relator boldly alleges that "MedCentris" submitted or presented false claims under 31 U.S.C. § 3729(A)(1)(A) and Louisiana Revised Statutes § 46:438.3(A) based on the results of a 2016 self-audit and several patient episodes. (FAC, ¶¶ 130-175).

First, Relator's allegations are allegedly supported by an April 2016 internal audit by MedCentris employee Tim Foret, which is attached to the Complaint as Exhibit A. (FAC, ¶¶ 130-131). According to Relator, the audit discovered that MedCentris "had knowledge that its practices led to the submission of false claims". (FAC, ¶ 130). Relator also alleges that the audit contained findings that certain "specific surgical debridements … were not medically necessary because they did not meet the LCD requirements" and that "specific debridements [ ] were up-coded." (FAC, ¶¶ 132-133). Second, Relator relies on examples of government health care patients to show MedCentris allegedly knowingly billed Medicare and/or Medicaid for alleged medically unnecessary and/or up-coded surgical debridements, skin substitutes, hyperbaric oxygen therapy, and/or E/M visits document Defendants violations of the False Claims Act and the Louisiana counterpart. (*See* FAC, ¶¶ 140-207).

Despite all the insinuation, nothing in the Relator's Complaint "details" an "actually submitted false claim." The Complaint does not identify any specific misrepresentation contained

14

in a specific form, or how those forms and billing practices are conducted. There are no allegations concerning how many purported false claims were submitted, the frequency of such submissions, the amount of reimbursement that was requested, or the total amount of funds alleged improperly received.[2]

Relator does not attach to the Complaint a copy of a single bill or payment that Medicare or Medicaid made. *See United States v. Integracare Home Health Servs., Inc.*, No. 6:14-cv-480-RWS-KNM, 2017 U.S. Dist. LEXIS 238172, at \*28-29 (E.D. Tex. July 6, 2017) (holding that "Relator's unsubstantiated assertions regarding exhibits not attached to the Complaint fail to show that Defendants submitted false … claims with the particularity required under Rule 9."). Indeed, the Complaint is silent on any claim forms purportedly used, when they were used, to whom they were submitted (sometimes broadly stating "Medicare and/or Medicaid", *see* FAC, ¶¶ 140, 169, 217), which representations were false, how the purported false claims were submitted, whether they were accepted, or what payments were received by MedCentris. In all, Relator fails to identify any claim that was actually submitted to a government payor and her false claim counts should be dismissed.

## C.  Relator does not plead with particularity the details of any actually submitted *false* claims.

Because Relator has pled insufficient details regarding actual claims submitted by MedCentris Defendants, she has also failed to plead that any submitted claims were false. Even if

---

[2] Of note, Relator states: "Despite her attempts to resist the persistent pressure to perform unnecessary and up-coded procedures from the Facility Defendants, Relator Proctor believes this pressure did impact some of her clinical decisions and resulted in falsely inflated government health care payments to Facilities." (FAC, ¶ 127). Relator does not expand on these instances. Therefore, Relator offers no factual allegations regarding the few instances where she allegedly has personal knowledge of medically unnecessary and up-coded procedures and subsequent billings to the government specifically within her knowledge.

#103986606v3

the submission or presentment of claims were proven, the Complaint contains only conclusory allegations as to their falsity.

Falsity is an essential element of an FCA violation. *U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 747 (2023) (citing 31 U.S.C. § 3729(a)(1)(A)). "FCA claims can be either legally false or factually false." *United States v. Omnicare, Inc.*, 663 Fed. Appx. 368, 373 (5th Cir. 2016) (citing *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) (recognizing factually false claims as "the paradigmatic case" and legally false claims as the "certification theory")). "A claim is factually false when the information provided to the government for reimbursement is inaccurate." *Id.* (citing *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008)). A 'factually false' claim "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *United States ex rel. O'Neill v. Gopalam*, No. 18-567-JWD-RLB, 2023 U.S. Dist. LEXIS 175184, at *60 (M.D. La. Sept. 29, 2023) (citing *U.S. ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487, 496-97 (S.D. Tex. 2003), *aff'd*, 111 F. App'x 296 (5th Cir. 2004)); *United States ex rel. Patel v. Catholic Health Initiatives*, 312 F. Supp. 3d 584, 602 (S.D. Tex. 2018). A claim is legally false when "a claimant . . . falsely certifies compliance with [a] statute or regulation." *Omnicare*, 663 Fed. Appx. at 373 (citing *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997)).

It is not clear from the Complaint, but Relator appears to plead falsity under both theories – the up-coding allegations being factually false and the certifications that the procedures were medically necessary being legally false. But, more importantly, Relator's subjective disagreement over MedCentris' medical opinions cannot propound FCA liability on MedCentris Defendants.

    1.    <u>The Differences of Opinion Between Relator and MedCentris Defendants Does Not Equate to Falsity Under the FCA.</u>

16

On a matter outside the scope of her expertise, Relator is putting her own subjective opinion over that of an entire medical group of medical specialists and calling the later opinion fraudulent. Relator's difference of opinion does not equate to a *false* claim under the FCA.

The Centers for Medicare & Medicaid Services' ("CMS") commentary signals that "well-founded clinical judgments should be granted deference." *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1295 (11th Cir. 2019). Indeed, "a reasonable difference of opinion among physicians reviewing medical documentation ex post is not sufficient on its own to suggest that those judgments—or any claims based on them—are false under the FCA." *Id.* at 1297. "[W]hen a provider submits a claim … 'based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness,' … the claim cannot be 'false'—and thus cannot trigger FCA liability—if the underlying clinical judgment does not reflect an objective falsehood." *See id.*; *see also United States ex rel. Wall v. Vista Hospice Care, Inc.*, 2016 U.S. Dist. LEXIS 80160, at *17 (N.D. Tex. June 20, 2016) ("[A]n FCA claim about the exercise of [a physician's clinical] judgment must be predicated on the presence of an objectively verifiable fact at odds with the exercise of that judgment, not a matter of questioning subjective clinical analysis."); *United States ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818, 836 (7th Cir. 2011) (stating that "[a] statement may be deemed 'false' for purposes of the False Claims Act only if the statement presents 'an objective falsehood'") (citing *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008)); *United States ex rel. Loughren v. Unum Grp.*, 613 F.3d 300, 310 (1st Cir. 2010) (explaining that an opinion may qualify as a false statement for purposes of the FCA where the speaker "knows facts 'which would preclude such an opinion'") (quoting *United States ex rel. Siewick v. Jamieson Science and Engineering, Inc.*, 214 F.3d 1372, 1378 (D.C. Cir. 2000)); *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370,

376 (4th Cir. 2008)); *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 959 (10th Cir. 2008) ("At a minimum the FCA requires proof of an objective falsehood.").[3]

Relator could prove that this was not a mere difference of opinion, that these were objective falsehoods worthy of liability under the FCA by showing that (i) the certifying physician failed to review a patient's medical records, or otherwise familiarize himself with the patient's condition, or (ii) the physician did not, in fact, subjectively believe in the medical necessity at the time of certification, or (iii) having expert evidence prove that no reasonable physician could have concluded that the treatment was medically necessary given the relevant medical records. *See AseraCare*, 938 F.3d at 1296-1297 (noting that a physician's ill-formed "clinical judgment" reflects an objective falsehood). However, Relator's Complaint does not allege any of these predicates, and instead it alleges no more than a difference of opinion on a medical judgment, that various procedures were "unnecessary" based on her conclusions from a review of medical records and her personally selected conditions to contrarily re-diagnose an anonymous individual who required complex medical care. Accordingly, Relator has failed to allege the essential element of falsity in her FCA claims and these counts should be dismissed. *See Schutte*, 598 U.S. at 747; *see also United States ex rel. McKoy v. Atlanta Primary Care Peachtree, PC*, No. 3:21-cv-178, 2023 U.S. Dist. LEXIS 216515, at *16–17 (N.D. Ga. Oct. 24, 2023) (declining to infer that laboratory tests were medically unnecessary where the relator did not explicitly connect the allegations regarding the claims to an explanation of falsity, instead providing only "conclusory averments" that the tests were medically unnecessary).

---

[3] MedCentris Defendants acknowledge that the Fifth Circuit has declined to address whether the FCA requires an objective falsity standard like these courts. *See United States ex rel. Aldridge v. Corp. Mgmt.*, 78 F.4th 727, 739 (5th Cir. 2023). Nevertheless, MedCentris Defendants urge this Court to apply the rulings of the several Circuits of the Court of Appeal holding the objective falsity standard applies.

#103986606v3

2.    Relator's Complaint Does Not Establish Legal Falsity of Any Submitted Claim Even if the Objective Falsity Standard Does Not Apply.

Relator claims that MedCentris violated the applicable standard of care in conducting debridements on several patients (FAC, ¶¶ 141-148), providing medically unnecessary skin substitutes to three patients (FAC, ¶ 169), providing medically unnecessary hyperbaric oxygen therapy on one patient (FAC, ¶ 175), and conducting medically unnecessary E/M visits (*See* FAC, ¶¶ 204-207). Relator's claims are largely based on a review of the patients' medical records and Superbill submissions, none of which are attached to the Complaint. (*See* FAC, ¶¶ 141-207).

Taking the Complaint as fact, the applicable standard of care during this time for wound care was the Wound Care Local Coverage Determination, LCD L35125 ("Wound Care LCD"). (FAC, ¶ 71).[4] LCD L35401 ("Skin Substitute LCD") allegedly governed the application of skin substitutes. (FAC, ¶ 72). Meanwhile, a CMS National Coverage Determination governed the provision and billing of Hyberbaric Oxygen Therapy ("HBOT NCD"). (FAC, ¶ 73). Relator does not cite to any regulatory equivalent regarding E/M visits. According to Relator, MedCentris Defendants habitually and systematically ignored the conditions of payment of the Medicare program and the Wound Care LCD, Skin Substitute LCD, HBOT NCD in its provision of procedures, but requested and received payment from Medicare and Medicaid for such procedures. (*See* FAC, ¶¶ 71-73; 161-169).

"[W]ound care is defined as care of wounds that are refractory to healing or have complicated healing cycles either because of the nature of the wound itself or because of complicating metabolic and/or physiological factors." *Wound Care L35125*, Centers for Medicare

---

[4] Relator opened the door to LCDs by citing them in the Complaint. (*See* FAC, ¶¶ 71-73; ¶ 161; ¶ 169). If necessary, Defendants respectfully request that the Court take judicial notice of the applicable LCD. *See, e.g.*, *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005) (taking judicial notice of information on a government website).

&          Medicaid          Services,          https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=35125 (last visited May 21, 2025). "Wound care must be performed in accordance with accepted standards for medical and surgical treatment of wounds." *Id.* A wound care treatment method is not necessary and reasonable if the method is "unproven by valid scientific literature." *Id.* Regarding debridements, [t]he appropriate interval and frequency of debridement depends on the individual clinical characteristics of the patient and the extent of the wound." *Id.; see also United States v. C/HCA, Inc.*, No. 19-14086, 2023 WL 8679766, at \*7 (S.D. Fla. Nov. 9, 2023) (agreeing with "the general contention that alleged frequency of debridement procedures performed on patients alone is not enough to establish falsity").

For skin substitutes, "[i]f the patient meets all criteria as outlined in this LCD, application of a skin substitute graft/CTP in the treatment of [diabetic foot ulcer ("DFU")]  and [venous leg ulcer ("VLU")] is considered reasonable and necessary[.]" *Skin Substitute Grafts/Cellular and Tissue-Based Products for the Treatment of Diabetic Foot Ulcers and Venous Leg Ulcers L35041*, Centers   for   Medicare   &   Medicaid   Services,   https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=35041 (last visited May 21, 2025). A skin substitute graft may be considered reasonable and necessary if the patient's DFU or VLU fails to respond to standard of care treatment after 4 weeks (28 days). *Id.* "[C]overage will be provided for skin substitute grafts/CTP that have peer-reviewed, published evidence supporting their use as an adjunctive treatment for chronic ulcers shown to have failed established methods of healing." *Id.*

Finally, reimbursement for hyperbaric oxygen therapy is limited to 15 certain conditions, notably including diabetic wounds of the lower extremities in patients who meet three criteria: (a) patient has type I or type II diabetes and has a lower extremity wound that is due to diabetes; (b) patient has a wound classified as Wagner grade III or higher; and (c) patient has failed an adequate

course of standard wound therapy. *Hyperbaric Oxygen Therapy 20.29*, Centers for Medicare & Medicaid Services, https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=35041 (last visited May 21, 2025). "The use of [hyperbaric oxygen] therapy is covered as adjunctive therapy only after there are no measurable signs of healing for at least 30-days of treatment with standard wound therapy and must be used in addition to standard wound care." *Id.*

All of MedCentris Defendants' various wound care treatments were performed in accordance with valid, scientific, peer-reviewed, and published medical literature, which is in line with the applicable coverage determinations. Each modality, debridement, skin substitutes, and hyperbaric oxygen therapy, reflects a treatment approach grounded in the prevailing clinical standards and supported by a substantial body of scholarly evidence. Relator makes no allegations that MedCentris Defendants' treatments were contrary to any medical evidence, and instead avers that these prevailing clinical standards are contrary only to her subjective medical opinions.

Moreover, as per the LCD, the appropriate level and frequency of debridement is not determined solely by the extent or size of a wound, as Relator suggests, but rather by the individual clinical characteristics of the individual patient, which Relator does not include in her Complaint. As such, a treatment plan that calls for more frequent or advanced debridement may be medically necessary for one patient, but not another, even if their wounds appear similar.

Additionally, Relator's failure to produce a single medical record is fatal to any claim that the procedures at issue were not medically necessary or reasonable. (*See, e.g.*, FAC, 177). Medical records are required to determine whether a wound care, skin substitute, or hyperbaric oxygen therapy procedure is medically necessary and reasonable. *See Wound Care L35125*, *supra* ("Medicare coverage for wound care on a continuing basis, for a given wound, in a given patient,

is *contingent upon evidence documented in the patient's medical record* that the wound is improving in response to the wound care being provided) (emphasis added); *Skin Substitute L35041*, *supra* (noting that care is dependent on patient's diabetes and management history and an assessment of patient's clinical history); *Hyperbaric Oxygen Therapy*, *supra* (same). Without such documentation, there is no basis to second-guess a clinical judgment or to assert that treatment was improper. The absence of these records leaves the Court with nothing but the Relator's say-so, which is insufficient as a matter of law. For all of these reasons, Relator has failed to prove the legal falsity of any claim.

3.    <u>Relator's Complaint Does Not Establish Factual Falsity of Any Submitted Claim.</u>

Relator cannot demonstrate factual falsity either in her up-coding allegations. *See United States ex rel. Patel v. Catholic Health Initiatives*, 312 F. Supp. 3d 584, 603 (S.D. Tex. 2018) (acknowledging that an example of factual falsity may be seeking reimbursement for services that it misrepresented to the government). Relator alleges that MedCentris up coded the level of debridement and E/M visits based on her review of patients' medical records and other unattached documentation. (*See* FAC, ¶¶ 141-148; ¶¶ 204-207). Relator also includes examples based on her personal knowledge that a MedCentris NP allegedly up-coded E/M visits and that a MedCentris executive up-coded a debridement procedure. (*See* FAC, ¶118; ¶ 207(a)). Relator also claims another MedCentris NP had to have up-coded her E/M visits based upon Relator's personal knowledge of the NP's "typical schedule." (*See* FAC, ¶207(c)).

The Complaint fails to include factual allegations establishing that any of Relator's general claims, or her particular examples, were submitted and that they were factually false. Relator bases her opinions on examples allegedly supported by medical records and Superbill admissions but attaches none of them to the Complaint, causing the Court and MedCentris Defendants to simply

rely on her word that these episodes of patient care reflect her memory and that these records reflect what she says they reflect. Because the Complaint fails to particularly plead facts identifying even one legally or factually false claim, Relator's false claims counts against MedCentris Defendants should be dismissed. *See U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (dismissing allegations that defendants submitted medically unnecessary claims because complaint did not provide details to establish they were medically unnecessary).

> **D.    Realtor does not allege particular details of a _scheme_ to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.**

If a plaintiff's allegations are "merely consistent with" an alleged fraudulent scheme, or if there is an "obvious alternative explanation" suggesting that the conduct at issue was lawful, then a plaintiff cannot state a plausible claim for relief. *See Iqbal*, 556 U.S. at 682 (citation omitted).

Relator alleges that MedCentris Defendants are involved in a fraudulent scheme to submit false claims by training and encouraging Medicare and Medicaid Fraud, evidenced by her personal knowledge, the April 2016 internal audit, and exemplified by her allegedly representative examples of patient treatment. (*See* FAC, ¶¶ 90-214). Relator generally alleges the scheme as:

> Defendant Wound Care Management L.L.C. d.b.a. MedCentris ("MedCentris"), violated the False Claims Act (31 U.S.C. 3729 et. seq.) by submitting, conspiring with its co-defendants to submit, and causing the submission of false claims for payment to federal and state health care programs, including the Medicare and Medicaid programs, by systematically billing federal and state government health care programs for medically unnecessary and often contra-indicated services. Specifically, MedCentris has routinely billed Medicare and Medicaid for medically unnecessary, falsely "up-coded" and harmful wound debridements, medically unnecessary and up-coded patient evaluation and maintenance (E/M) services, medically unnecessary and contraindicated application of Skin Subsitute products, and medically unnecessary Hyperbaric Oxygen Therapy.

23

(FAC, ¶ 1). Relator describes the foregoing as the "MedCentris Way", which is "systematic up-coding and unnecessary procedures, as well as instruction on how to avoid scrutiny from Medicare auditors", i.e. "systematic Medicare fraud." (FAC, ¶ 31; ¶ 90). Relator also alleges that MedCentris has a "mandated plan of care of persistent surgical debridement without examining any other factors" and that Defendants' "plan of care [is] designed to prevent healing [in order] to maximize the Defendants' profits." (FAC, ¶ 158; ¶ 214). Relator alleges that the "systemic performance of medically unnecessary surgical debridements" is confirmed by the 2016 internal audit and "MedCentris' own medical review of its patient records." (FAC, ¶ 135). While the Complaint references a fraudulent scheme, this Court is not required to accept as true allegations that are contradicted, or legal conclusions couched as factual allegations. *See United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 379 (5th Cir. 2003) (quoting *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992).

However, Relator's allegations regarding a "scheme" fare no better than their allegations regarding individual false claims. These conclusory allegations of a fraudulent scheme do not meet Rule 9's heightened pleading requirement. The schematic allegations upheld by the Fifth Circuit in *Grubbs* included the fact that "[t]he complaint sets out the particular workings of a scheme that was communicated directly to the relator by those perpetrating the fraud." *See* 565 F.3d at 191-92. There, the relator was a newly hired psychiatrist with the defendant. *Id.* at 184. Relator described in his complaint how the two defendants, one a chairman of the medical staff of the defendant hospital's psychiatric subsection and the other a psychiatrist at the hospital, invited him to dinner before his first weekend on-call shift. *Id.* According to relator, "the doctors allegedly divulged to him their fraudulent billing scheme and instructed him on how he was to contribute to the scheme." *Id.* Relator further alleged that during his first on-call weekend, "the nursing staff did indeed

24

attempt to assist him in recording face-to-face physician visits that had not occurred and that were based solely on information obtained through nursing contacts with the patients." *Id.* In his complaint, relator claimed that when he reported the practice to the hospital administrator the next day, they allegedly replied: "[y]ou certainly figured that out quickly." *Id.*

Relator's Complaint does not meet the *Grubbs* standard. Her conclusory allegations of a fraudulent scheme to submit false claims are not supported by "reliable indicia that lead to a strong inference that claims were actually submitted" because her bases are a "2016 internal audit", which is, in reality, a simple PowerPoint presentation of only "conclusions", and her attempts to describe what MedCentris' own medical review of its patient records found without alleging any basis for that knowledge. This approach to pleading cannot survive MedCentris Defendants' motion to dismiss. *United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 895 (5th Cir. 2013) (affirming dismissal of FCA case where "allegations of a scheme to submit fraudulent claims are entirely conclusory, do not offer factual information with sufficient indicia of reliability, and do not demonstrate a strong inference that the claims were presented to the Government").

Additionally, Relator's reliance on statistics, alleging that because MedCentris Defendants debrided patients more than most shows a scheme to submit false claims, is misplaced. In *United States ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*, 816 Fed. Appx. 892, 897-98 (5th Cir. 2020) (per curiam), the Fifth Circuit concluded that the relator failed to meet the pleading requirements of an FCA claim when defendant was simply ahead of the healthcare industry in following new CMS guidelines because it strongly indicated that a legal and obvious alternative explanation for the abundance of a course of treatment.

Similarly, MedCentris' aggressive wound care decisions in this time period were ahead of the healthcare industry and their success created the current standard of care for wound treatment. Moreover, NPs with MedCentris Defendants may debride more than the national average NP, but that is because the average NP practices family medicine or primary care; the average NP is not involved in sub-specialties like MedCentris, so it is entirely reasonable that NPs employed with a wound care sub-specialist may have higher rates of debridement compared to the national average. Consequently, the misplaced statistical conclusion raised by Relator is simply a function of an overall higher volume and percentage of wound-care issues (i.e., 100% of the MedCentris Defendant's practice) versus other medical practices that may treat a variety of ailments and conditions in addition to wounds. For all of these reasons, Relator fails to plead a scheme to submit false claims and only obtusely describes the start of a new era in wound care treatment.

E.    **Relator does not plead with particularity that MedCentris Defendants submitted false claims or engaged in a scheme to submit false claims with the required _scienter_.**

The FCA imposes liability on those who "_knowingly_ presen[t] . . . a false or fraudulent claim for payment or approval." § 3729(a)(1)(A) (emphasis added). Thus, two essential elements of an FCA violation are (1) the falsity of the claim and (2) the defendant's knowledge of the claim's falsity. _Schutte_, 598 U.S. at 747.

The FCA defines the term "knowingly" as encompassing three mental states: (1) that the person has "actual knowledge" of the falsity, § 3729(b)(1)(A)(i); (2) that the person "acts in deliberate ignorance of the truth or falsity of the information," § 3729(b)(1)(A)(ii); or (3) that the person "acts in reckless disregard of the truth or falsity of the information," § 3729(b)(1)(A)(iii). _See Schutte_, 598 U.S. at 749-750. "What matters for an FCA case is whether the defendant knew

26

the claim was false." *Id.* The FCA's scienter requirement is "rigorous" and requires "strict enforcement". *Escobar*, 579 U.S. at 192.

In short, the MedCentris Defendants must have had actual knowledge, or acted with deliberate ignorance, or recklessness when submitting the false claim. *See Schutte*, 598 U.S. at 750-52 (indicating the FCA's standards focus primarily on what the defendants thought and believed when submitting the false claim, not what the defendant may have thought after submitting it). "Actual knowledge" refers to whether a person is "aware of" information; "deliberate ignorance" encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity; and "reckless disregard" similarly captures defendants who are conscious of a substantial and unjustifiable risk that their claims are false but submit the claims anyway. *See id.* at 751.

Relator alleges that MedCentris Defendants "knowingly billed Medicare and/or Medicare for repetitive unnecessary and/or up-coded surgical debridements". (*See* FAC, ¶ 136; ¶ 140). Relator also alleges that MedCentris President Todd Shaffett instructed her to knowingly submit false claims. (*See* FAC, ¶¶ 116-123). Relator alleges that MedCentris had knowledge (whether actual or constructive is unclear) of their alleged systematic fraud because of the April 2016 internal audit by Tim Foret. (*See* FAC, ¶ 130).[5]

Relator's broad-brush allegations fail to allege any facts about MedCentris Defendants' knowledge or beliefs as to the falsity of any actually submitted claims, which falls short of pleading Defendants' subjective knowledge as required in *Schutte*. Relator wants this Court to infer the scienter of MedCentris Defendants, and that they must have known of "systemic Medicare fraud",

---

[5] Relator does not even attempt to plead that MedCentris Defendants acted with deliberate ignorance or reckless disregard.

from a PowerPoint that does not discuss or even mention any fraudulent activity and her comments that were predicated on nothing more than her unsupported, subjective opinions. This does not fulfill the pleading standard for the FCA's scienter requirement. *See, e.g.*, *United States ex rel. Frey v. Health Mgmt. Sys.*, No. 4:21-CV-02024, 2023 U.S. Dist. LEXIS 46945, at *27-28 (S.D. Tex. Feb. 10, 2023) (dismissing FCA case for failure to plead scienter because the conclusory allegation that defendants "must have known" of the fraud by virtue of their size and sophistication was not "a substitute for pleading facts supporting an inference of fraud"). Because Relator does not adequately plead that MedCentris Defendants possessed the requisite scienter, the FCA claims should all be dismissed.

## II.    Counts 3 and 9 Should Be Dismissed Because Realtor Fails to Allege Reverse False Claims.

Relators fail to allege a specific false statement or a definite obligation to pay money to the government at the time of any false statements, and thus, fails to plead that Defendants violated the reverse false claim provision of the FCA and Louisiana Revised Statutes § 46:438.3(C), thus, Counts 3 and 9 should be dismissed.[6] Relator summarily alleges that Defendants violated the reverse false claims provision of the FCA, 31 U.S.C. 43729(A)(1)(G), and the Louisiana equivalent, Louisiana Revised Statutes § 46:438.3(C), by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government and the Louisiana Medicaid Program and knowingly avoiding an obligation to pay money or property to the Government and the Louisiana Medicaid. (*See* FAC, ¶ 225; ¶ 253).

---

[6] "It is called a reverse false claim because the action of the defendant results not in improper payment to defendant from the Government, but rather no payment to the Government when payment is otherwise obligated." *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003).

28

To sufficiently allege a reverse FCA violation, the Complaint must contain well-pleaded allegations that MedCentris Defendants: (1) had an obligation to "pay or transmit money or property to the Government," and (2) made a false record or statement material to, or concealed and/or improperly avoided or decreased any such obligation. 31 U.S.C. § 3729(a)(1)(G).

Outside of Relator's recitation of the facial language of the statues, there is no allegation that a Defendant had any obligation to pay funds to the government and avoided doing so. (*See* FAC, ¶¶ 12, 33, 45, 225, 253). "Where a complaint 'makes no mention of any financial obligation that the [defendants] owed to the government,' and 'does not specifically reference any false records or statements used to decrease . . . an obligation,' the court should dismiss the subsection (a)(1)(G) claim." *United States ex rel. Doe v. Lincare Holdings, Inc.*, No. 5:15-cv-19, 2017 U.S. Dist. LEXIS 27173, at *19-20 (S.D. Miss. Feb. 27, 2017)); *United States v. Integaracare Home Health Servs., Inc.*, No. 6:14-cv-480, 2017 U.S. Dist. LEXIS 238172, at *31-33 (E.D. Tex. July 6, 2017) (holding that relator did not properly allege a reverse FCA claim when relator did not allege when defendants identified any overpayments or when and how defendants knew that such overpayments were false). Relator merely includes "a formulaic recitation of the elements" of a claim under § 3729(a)(1)(G) and echoes the allegations supporting the FCA counts, which is insufficient to meet the requirements of Rules 9(b) and 12(b)(6). *See United States v. Healthcare Liaison Professionals, Inc.*, No. 3:13-cv-0023-M, 2019 U.S. Dist. LEXIS 243573, at *22 (N.D. Tex. 2019) (holding relator failed to plead when they alleged no specific facts that defendant had an obligation to pay the government); *United States ex rel. Porter v. HCA Health Servs. of Okla., Inc.*, NO. 3:09-CV-0992, 2011 U.S. Dist. LEXIS 115853, at *23 (N.D. Tex. Sep. 30, 2011) (holding hat recasting his false statement claim as a reverse false claim was not actionable). Accordingly, Counts 3 and 9 should be dismissed.

### III.    Counts 4 and 10 Should Be Dismissed Because Realtor Fails to Plead a Conspiracy.

Since Relator fails to plead adequate false claims, Relator's conspiracy claim under 31 U.S.C. § 3729(a)(1)(C) inherently fails as well, as liability under 31 U.S.C. § 3729(a)(1)(C) is dependent upon liability under 31 U.S.C. § 3729(a)(1)(A) or 31 U.S.C. § 3729(a)(1)(B). *See United States ex rel. O'Neill v. Gopalam*, No. 18-567-JWD-RLB, 2023 U.S. Dist. LEXIS 175184, at *31 (M.D. La. Sept. 29, 2023); *United States v. ITT Educ. Servs.*, 284 F. Supp. 2d 487, 509-510 (S.D. Tex. 2003) (holding relators' conspiracy claim fails because none of the FCA claims state a cause of action, thus the conspiracy claim fails as a matter of law). Therefore, Counts 4 and 10 should be dismissed for the fundamental reason.

Even if the complaint did somehow adequately plead underlying false claims, Relator has not adequately pled an FCA conspiracy. Relator again only summarily alleges that Defendants conspired to commit a violation of the FCA and defraud the Louisiana Medicaid Program under 31 U.S.C. § 3729(a)(1)(C) and Louisiana Revised Statutes § 46:438.3(D), respectively. (*See* FAC, ¶¶ 227-231; ¶¶ 255-258).

The Complaint fails to plead, as required by Rule 9(b), both "the existence of an unlawful agreement between [D]efendants to get a false or fraudulent claim allowed or paid by [the government]" and at least one act performed in furtherance of the conspiracy. *See United States ex rel. Farmer v. Houston*, 523 F.3d 333, 343 (5th Cir. 2008). "[A] plaintiff alleging a conspiracy to commit fraud must 'plead with particularity the conspiracy as well as the overt acts . . . taken in furtherance of the conspiracy.'" *Grubbs*, 565 F.3d at 193 (quoting *FC Inv. Group LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1097 (D.C. Cir. 2008)).

Relator vaguely, ambiguously, and without any detail whatsoever, refers to "conspiring" among the co-defendants to submit false claims to government healthcare programs (FAC, ¶ 1; ¶

30

12; ¶ 123) and references "MedCentris' obligations under its conspiratorial and illegally remunerative contracts with LTAC facilities" but she is not clear on what the supposed agreement is between the co-defendants. (*See, e.g.*, FAC, ¶ 123 (alleging that MedCentris' obligations under the alleged conspiracy is "to initially perform and bill for unnecessary surgical debridements _or_ to bill for such surgical debridements even if they didn't perform them, then knowingly continue performing and billing unnecessary _and/or_ up-coded procedures in order to garner the full fraudulently inflated DRG revenue for its co-conspirators.") (emphasis added). Only Relator's description of Patient 9's care includes a reference to this alleged conspiracy. (*See* FAC, ¶ 157). But Relator fails to provide any basis for these allegations and does not detail when or how any alleged conspiracy arose, specifically who agreed with whom, the workings of the alleged scheme, or what was done to affect the conspiracy. *See United States ex rel. Dones v. Harlingen Med. Ctr.*, 701 F. Supp. 3d 636, 645 *(S.D. Tex. 2023)* (finding relator's allegations did not establish a plausible conspiracy when relator failed to allege when the agreement took place, the participants apart from one doctor, or the manner in which the agreement occurred, e.g., via e-mail, an in-person meeting, telephone calls). Therefore, the Court should dismiss Counts 4 and 10 for failing to plead an adequate conspiracy claim.

## IV.    Counts 5 and 6 Should Be Dismissed Because Relator Fails to Plead False Claims Based On the Anti-Kickback Statute and Stark Law.

Relator alleges Defendants are liable for false claims under the Anti-Kickback Statute (31 U.S.C. § 3729(A)(1)(A); 42 U.S.C. § 1320a-7b(B)) ("AKS") and the Stark Law (31 U.S.C. § 3729(A)(1)(A); 42 U.S.C. § 1395nn). (FAC, ¶¶ 233-236; 238-241). Because Relator has failed to adequately plead submission or presentment of false claims, Relator's theory of false claims under the AKS and Stark Law must be dismissed. *See U.S. ex rel. Hartwig v. Medtronic, Inc.*, No. 3:11CV413-CWR-LRA, 2014 U.S. Dist. LEXIS 44475, at *12 (S.D. Miss. Mar. 31, 2014)

#103986606v3

("However, an AKS violation alone does not create a cause of action under the FCA because evidence of an actual false claim is essential to an FCA violation."); *United States ex rel. Okeeffe v. River Oaks Mgmt. Co., LLC*, No. 2:16-CV-48-KS-MTP, 2017 U.S. Dist. LEXIS 172280, at *1-3 (S.D. Miss. Oct. 18, 2017) (dismissing independent claims in *qui tam* action under FCA where relator was physician employed by defendants and alleged that defendants conspired to violate the AKS, Stark Law, and FCA by providing payments to physicians as remuneration for referrals of patients, and knowingly submitting claims for reimbursement to Medicare and Medicaid that falsely represented that the claims complied with applicable federal law).

Even if Relator did adequately plead submission or presentment of false claims, which is not the case, Relator's claims of false claims under the AKS and Stark Law still must be dismissed. "[A] relator can bring an FCA claim based on a violation of the Anti-Kickback Statute. But the Anti-Kickback Statute itself is a criminal statute, and it does not provide for a private right of action. … Like the Anti-Kickback Statute, the Stark Law does not create a private right of action." *United States ex rel. Bruno v. Schaeffer*, 328 F. Supp. 3d 550, 562 (M.D. La. 2018).

A violation of the AKS and Stark Law can serve as the basis for a FCA claim when the government has conditioned payment of a claim upon the claimant's certification of compliance with the statutes and the claimant falsely certifies compliance. *See Nunnally*, 519 Fed. Appx. at 893 (citing *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997)). Thus, a provider is liable under the AKS and/or Stark Law "where the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, [and] a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." *Thompson*, 125 F.3d at 902.

32

Here, Relator's Complaint contains no allegations that MedCentris Defendants falsely certified compliance with the AKS or Stark Law, or even needed to do so. Because there is no basis to infer from the Complaint that MedCentris Defendants expressly or implicitly certified compliance with the AKS and/or Stark Law as a part of submitting a claim(s) to the government (or infer that MedCentris Defendants were not in compliance with those statutes when they made the certification), these counts should be dismissed.

Alternatively, even if the Complaint alleges submission of certified, false claims, which it does not, Counts 5 and 6 should be dismissed because Relator fails to adequately plead false claims based on the AKS and Stark Law. Elements of Relator's AKS and Stark Law violations must also be pled with particularity under Rule 9(b) because they are brought as a FCA claim. *See Nunnally*, 519 Fed. Appx. at 894.

The AKS, in pertinent part, prohibits any knowingly and willfully soliciting, receiving, offering, or paying any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, to any person in return for referring an individual to a person for the furnishing, or arranging for the furnishing, of any item or service for which payment may be made in whole or in part under a Federal health care program, or to refer an individual to a person for the furnishing, or arranging for the furnishing, of any item or service for which payment may be made in whole or in part under a Federal health care program. *See* 42 U.S.C. § 1320a-7b(b)(1)-(2).

The Stark Law prohibits physicians from referring patients to an entity for certain "designated health services" if the referring physician has a nonexempt "financial relationship" with such entity. *See* 42 U.S.C. § 1395nn(a(1). A physician has a "financial relationship" with an entity if the physician has "an ownership or investment interest in the entity" or a "compensation

33

arrangement" with the entity. *See* 42 U.S.C. § 1395nn(a)(2). A "compensation arrangement"

includes "any arrangement involving any remuneration between a physician" and an entity. 42

U.S.C. § 1395nn(h)(1)(A). "Remuneration" "includes any remuneration, directly or indirectly,

overtly or covertly, in cash or in kind." 42 U.S.C. § 1395nn(h)(1)(B).

According to Relator, the illegal remuneration under the Anti-Kickback Statute and Stark

Law is that:

> In exchange for the opportunity to make money through an
> exclusive wound care contract with LTAC facilities, MedCentris
> directs its clinicians to only refer potential long term care patients to
> its contracted LTAC facilities … [and] contracted LTACs refer all
> wound care services to be performed within a contracted LTAC to
> MedCentris, in exchange for inpatient referrals and MedCentris'
> creation of additional revenue for the LTAC through pervasive up-
> coding and performance of medically unnecessary procedures. …
> Both contracted LTAC facilities and MedCentris bill government
> healthcare programs for services provided according to illegal and
> improper referral arrangements and therefore violate the Anti-
> Kickback Statute and the Stark Law.

(*See* FAC, ¶¶ 181-183).

These allegations are facially conclusory, fail to meet Rule 9(b)'s heightened pleading

standard, and the claims should be dismissed accordingly. *See Nunnally*, 519 Fed. Appx. at 894

(holding that the relator had not sufficiently plead the content of the financial arrangements at

issue, the inducements, the improper referrals, the identity of any physicians, or the time period of

the scheme). Relator broadly alleges that MedCentris engaged with the "LTAC facilities" which

are broadly described without specifically alleging the specific participating parties, the improper

financial relationships between the specific parties, the illegal agreements between specific parties,

or the time period when this illegal activity took place. Accordingly, Counts 5 and 6 should be

dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), in addition to the Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), MedCentris Defendants respectfully request that the Court dismiss Relator's Complaint with prejudice.

Dated: June 4, 2025                      Respectfully submitted,

*/s/ Michael W. Magner*_____
JONES WALKER LLP
Michael W. Magner (#1206)
Brett S. Venn (#32954)
L. Davis Williams (#40996)
201 St. Charles Avenue, 50th Floor
New Orleans, Louisiana 70170
Tel: (504) 582-8316
Fax: (504) 589-8316
Email: mmagner@joneswalker.com
bvenn@joneswalker.com
dwilliams@joneswalker.com

*Attorneys for Defendants Wound Care*
*Management, LLC d/b/a MedCentris, Wound Care*
*Associates, L.L.C., and MedCentris Specialty Group*

35

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA and MEDICAL ASSISTANCE PROGRAMS** *Ex Rel.* **BRENDA PROCTOR** | **CIVIL ACTION NO. 2:18-cv-4234** |
| | **JUDGE: CARL J. BARBIER** |
| **VERSUS** | |
| **WOUND CARE MANAGEMENT, LLC d.b.a. MEDCENTRIS, et al.** | **MAGISTRATE JUDGE: EVA J. DOSSIER** |

## NOTICE OF SUBMISSION

PLEASE TAKE NOTICE that the Motion to Dismiss Relator's First Amended Complaint filed by Defendants Wound Care Management, LLC d/b/a MedCentris, Wound Care Associates, L.L.C., and MedCentris Specialty Group (the "MedCentris Defendants") will be submitted for consideration to the Honorable Carl J. Barbier, Judge of the United States District Court for the Eastern District of Louisiana, 500 Poydras Street, New Orleans, Louisiana 70130, on June 25, 2025 at 9:30 a.m.

Dated: June 4, 2025

Respectfully submitted,

*/s/ Michael W. Magner*_____
JONES WALKER LLP
Michael W. Magner (#1206)
Brett S. Venn (#32954)
L. Davis Williams (#40996)
201 St. Charles Avenue, 50th Floor
New Orleans, Louisiana 70170
Tel: (504) 582-8316
Fax: (504) 589-8316
Email: mmagner@joneswalker.com
bvenn@joneswalker.com
dwilliams@joneswalker.com

*Attorneys for Defendants Wound Care Management, LLC d/b/a MedCentris, Wound Care Associates, L.L.C., and MedCentris Specialty Group*

36

#103986606v3