UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| BRENDA PROCTOR | CIVIL ACTION |
| VERSUS | NO. 18-4234 |
| WOUND CARE MANAGEMENT, LLC ET AL. | SECTION "J" (3) |

**ORDER AND REASONS**

Before the Court is Plaintiff-Relator Brenda Proctor's Renewed Motion to Compel Discovery (R. Doc. 143). Defendants Wound Care Management, LLC d/b/a MedCentris; Wound Care Associates, L.L.C.; and MedCentris Specialty Group (collectively, "MedCentris") filed an opposition (R. Doc. 147). Relator replied (R. Doc. 150). For reasons explained below, the Motion (R. Doc. 143) is **GRANTED**.

## I. Background

The District Court summarized Relator's allegations as follows:

> This litigation arises out of wound care treatment performed by MedCentris Defendants at various Louisiana long-term acute care hospitals ("LTACHs"). Facility Defendants, which operate the referenced LTACHs, contracted with MedCentris Defendants to provide wound care services such as debridements, skin substitute procedures, and hyperbaric oxygen therapy. Relator Brenda Proctor, a family nurse practitioner employed by MedCentris from January 2016 to April 2017, raises this *qui tam* action, contending Defendants submitted false claims for Medicare and Medicaid reimbursement, up-coded treatments, and performed medically unnecessary services. Relator describes the multi-layered fraudulent scheme as the "MedCentris Way." Filed in April 2018, the Complaint asserts twelve claims, primarily under the federal False Claims Act [] but also under federal anti-kickback and referral statues and the Louisiana Medical Assistance Programs

> Integrity Law[]. In November 2024, the United States filed notice declining intervention in the litigation.[1]

Of the original twelve claims, two remain under 31 U.S.C. § 3729(a)(1) and three under La. R.S. § 46:438.3.[2]

The instant action results from Relator seeking, in the form of requests for production and interrogatories, information about events that occurred after her employment ended in April 2017.[3] Defendants' principal objection to the discovery is that it encompasses events not included in the complaint and, thus, that are irrelevant.[4] Defendants also maintain that the discovery sought is disproportional under Rule 26.[5]

## II. Legal Standard

### A. Relevance

Unless otherwise limited by court order, Fed. R. Civ. P. 26(b)(1) defines the scope of discovery: "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." A court assesses proportionality by considering (1) the importance of the issues at stake in the litigation; (2) the amount in controversy; (3) the parties' relative access to relevant information; (4) the parties' resources; (5) the importance of the proposed discovery in resolving the issues; and (6) whether the burden or expense of the

---

[1] R. Doc. 120 at 2.
[2] *Id.* at 15-16.
[3] R. Doc. 143-2 at 5.
[4] R. Doc. 147 at 1-2.
[5] *Id.* at 1.

proposed discovery outweighs its likely benefit. *Id.* Information need not be admissible in evidence to be discoverable. *Id.* In the Fifth Circuit, the party (or nonparty) "'opposing discovery bears the burden of showing the requested information is not relevant.'" *Spivey v. BP Expl. & Prod. Inc.*, No. CV 18-12878, 2024 WL 5246598, at *4 (E.D. La. Dec. 30, 2024) (quoting *Dotson v. Edmonson*, No. 16-15371, 2017 WL 11535244, at *2 (E.D. La. Nov. 21, 2017)). "This burden requires the objecting party to establish that the information has 'no possible bearing on the claim or defense of the party seeking discovery.'" *See id.* (quoting *Dotson*, 2017 WL 11535244, at *2). Objections to a discovery request must be stated with specificity and identify whether any materials are being withheld based on that objection. Fed. R. Civ. P. 33(b)(4); Fed. R. Civ. P. 34(b)(2)(C); *Rodriguez-Meza v. Venegas*, 2020 WL 14100945, at *3 (W.D. Tex. Nov. 30, 2020). General boilerplate discovery objections are insufficient. *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485-86 (5th Cir. 1990).

Under Rule 26(c)(1), courts may restrict discovery "for good cause…to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." The burden rests on the party objecting to the discovery request to demonstrate good cause exists to restrict discovery. *See Cazorla v. Koch Foods of Miss., L.L.C.*, 838 F.3d 540, 549 (5th Cir. 2016). Discovery rules are "accorded broad and liberal treatment to effect their purpose of adequately informing litigants in civil trials." *Herbert v. Lando*, 441 U.S. 153, 177 (1979) (citations omitted). Discovery rules, though, "are subject to the injunction of Rule 1 that they 'be construed to secure the

just, speedy, and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1). To that end, "the requirement of Rule 26(b)(1) that the material sought in discovery be 'relevant' should be firmly applied." *Id.*

**B. False Claims Act**

"The False Claims Act prohibits, in relevant part, 1) the presentment of a false claim to the Government, 2) the use of a false record or statement to get a false claim paid, and 3) conspiracies to get a false claim paid." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 183 (5th Cir. 2009). "To aid the rooting out of fraud, the Act provides for civil suits brought by both the Attorney General and by private persons, termed relators, who serve as a 'posse of *ad hoc* deputies to uncover and prosecute frauds against the government.'" *Id.* at 184 (quoting *United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.,* 961 F.2d 46, 49 (4th Cir. 1992)).

Complaints under the False Claims Act must meet the heightened pleading standard of Rule 9(b). *See id.* at 185 (citation omitted). "[T]o plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint" may allege the details of an actually submitted false claim, but it also "may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *See id.* at 190. Rule 9(b)'s heightened pleading standard thus acts as an initial "gatekeeper to discovery." *Id.* at 185. But Rule 9(b) should not "shoulder all the burden of policing abusive discovery." *Id.* at 191. Courts must

remain "vigilant" in "policing abusive discovery," including by tailoring the discovery to the "case at hand." *See id.*

## III. Analysis

Relator asks the Court to compel Defendants provide information relative to five categories covering 2015 through the present: (1) Defendants' compensation and incentive structure for clinical employees; (2) claims information and acquisition and pricing information for Defendants' claims for skin substitute products; (3) internal audits, claims denials, or assessment of the medical necessity of Defendants' wound care services; (4) communications, policies, and educational materials regarding the medical necessity of Defendants' wound care services and practices; and (5) Defendants' medical records for sampled sets of specific wound care services provided to Medicare and Medicaid patients.[6]

### A. Relevance

The Complaint consistently alleges that MedCentris is committing an ongoing fraudulent scheme. Relator claims that "MedCentris' entire business was predicated upon its willingness to commit fraud, by up-coding the services and procedures performed, routinely performing medically unnecessary services and willingness to refer patients to its contracted facilities."[7] According to Relator, "fraud and abuse [] permeates MedCentris' patient care" such that Relator left "in large part because of her fear of losing her medical license."[8] Relator maintains that even after being put

---

[6] R. Doc. 143-2 at 5.
[7] R. Doc. 9 ¶ 31.
[8] *Id* ¶¶ 31, 130.

on notice of the ongoing fraud, MedCentris persisted in incentivizing and performing medically-unnecessary surgical debridements.[9] Relator also alleges that, even after leaving Defendants' employment, her ongoing experience caring for Defendants' current or former patients confirms that the alleged fraud did not stop.[10] Relator thus maintains, the allegations make clear that the conduct at issue was ongoing and unlikely to cease.

Relator has submitted a declaration stating that, in connection with her current employment as a wound care practitioner, she has witnessed the "same pattern of care… including medically unnecessary surgical debridements" in patients treated by MedCentris.[11] Relator has gone so far as to identify specific patients whose post-2017 medical records, Relator believes, will substantiate her allegations of an ongoing fraudulent scheme.[12]

Defendants criticize Relator's reliance on her own declaration as an unpersuasive and untimely attempt to amend her lawsuit. In their relied-upon cases, however, assertions of ongoing fraudulent schemes were bald and conclusory. *See United States ex rel. Thomas v. St. Joseph Hospice, LLC*, No. 2:16-cv-143-KS-MTP, 2020 U.S. LEXIS 45031 (S.D. Miss. Mar. 16, 2020); *United States ex rel. Duxbury v.*

---

[9] *Id.* ¶¶ 130-135.
[10] *Id.* ¶ 31.
[11] R. Doc. 143-2 at 13, quoting R. Doc. 127-4 ¶ 7.
[12] R. Doc. 143-2 at 14. Although specific patients are listed as corroboration of Relator's position that this is not a fishing expedition, Relator seeks discovery beyond just the identified patients. Thus, for example, Relator seeks patient records of "outlier patients"—i.e., those who receive a particular number and type of debridements as set forth in a Medicare Local Coverage Determination. R. Doc. 143-2 at 14 n.3.

*Ortho Biotech Prods., L.P.*, 719 F.3d 21 (1st Cir. 2013); *United States ex rel. Stewart v. Louisiana Clinic*, No. 99-1767, 2003 U.S. Dist. LEXIS 9401 (E.D. La. June 4, 2003). In *Thomas*, the relators focused on events that occurred purely during their employment, without indication of an ongoing scheme. *United States ex rel. Thomas*, 2020 U.S. LEXIS 45031, at *4. In *Duxbury*, the relator's amended complaint presented a bald claim of a continued kickback scheme entirely devoid of evidence. *United States ex rel. Duxbury*, 719 F.3d at 39. In *Stewart*, the relators failed to articulate or identify with any particularity the accusations of which they alleged against various defendants. *United States ex rel. Stewart*, 2003 U.S. Dist. LEXIS 9401, at *3-*5. Accordingly, Defendants' cases lack the continuous nature that defines Relator's argument.

Here, Relator's "allegation that defendants engaged in a far-ranging scheme is a natural extension of the specific information asserted in its complaint." *United States ex rel. Branch Consultants, L.L.C. v. Allstate Ins. Co.*, No. CV 06-4091, 2010 WL 11627442, at *14 (E.D. La. Aug. 13, 2010). Taking these allegations as true "suggests that there are many more examples of the same conduct – a 'scheme,' even– that are not listed in the complaint. *See id.* Thus, Relator is entitled to discover information involving the same conduct described in the Complaint. *See id.*; *see also United States ex rel. Everest Principals, LLC v. Abbott Lab'ys*, 2024 WL 304082, at *4 (S.D. Cal. Jan. 26, 2024) ("The temporal scope of discovery may extend beyond the dates [relator] is able to allege specific instances of misconduct for when the complaint plausibly alleges that the misconduct at issue was part of the defendant's

broader policy and practice before and/or after the allegations of specific misconduct.") (citing *Dalitz v. AmSurg Corp.,* 2015 WL 8717398, at *4 (E.D. Cal. Dec. 15, 2015); *United States ex rel. Fiederer v. Healing Hearts Home Care, Inc.*, 2014 WL 4666531, at *5-6 (D. Nev. Sep. 18, 2014)). While Relator's declaration does not expand the scope of the pleadings, it does rebut Defendants' position that the discovery at issue is a "fishing expedition."

**B. Proportionality**

Defendants claim that Relator's discovery requests are disproportional since they extend beyond Relator's explicit allegations.[13] As established, Relator has consistently alleged that Defendants are committing an ongoing fraudulent scheme. When an FCA action relator sufficiently pleads an ongoing scheme, the relator is entitled to discovery of information on all alleged instances of fraud in the scheme. *United States ex rel. Branch Consultants, L.L.C.*, 2010 WL 11627442, at *12.

Both the importance of the issues and the amount in controversy weigh heavily in Relator's favor. Relator's claims are that Defendants have fraudulently acquired millions of dollars for skin substitutes.[14] *See United States v. Umbrella Fin. Servs., LLC*, No. 3:22-CV-2759-D, 2023 WL 4109697, at *2 (N.D. Tex. June 21, 2023) ("As a matter of public policy, allegations that a defendant has caused millions of dollars in tax harm is of high public importance.").

---

[13] R. Doc. 147 at 1.

[14] R. Doc. 143-2 at 17.

Relative access to relevant information and the parties' resources similarly weigh toward Relator. Beyond what she witnessed from her own professional experiences, Relator cannot obtain her discovery by other than from Defendants. Defendants, meanwhile, have not claimed that they do not possess the desired discovery, but only that Relator is not entitled to it. Yet "[l]imiting a relator's discovery rights to the duration of [the relator's] employment would weaken the [FCA] by placing limits on *qui tam* actions that do not exist for government-initiated actions." *United States ex rel. Fiederer*, 2014 WL 4666531, at *5. The clinical studies published by Defendants also tend to show that the sought information is readily accessible.[15] Defendants cannot "use their own billing and patient data to publish clinical study results and market their services, while simultaneously resisting producing the same data or claims information in the *qui tam* action challenging those very practices."[16]

Importance of the discovery and its burden are also in Relator's favor. Relator's claims involve Defendants administering an ongoing fraudulent enterprise, and the desired discovery is at the heart of the scheme. Defendants claim that Relator's requests "are more burdensome than they are beneficial."[17] Yet Relator does not request unfettered access to all files Defendants have maintained over the last eleven years, but requests the Court "order the parties to work cooperatively to develop a

[15] *Id.* at 15-16. The studies rely on Defendants' electronic health record database and "account receivable report" covering skin substitute applications between 2018 and 2023.

[16] *Id* at 16.

[17] R. Doc. 147 at 17.

sampling plan and procedure for Defendants' production of responsive materials."[18] Further, although Defendants suggests that additional discovery would be burdensome, there is no evidence provided related to the costs or resources required to locate responsive materials. Evidence that a prior production was expensive is insufficient on the current record. Boilerplate assertions that documents are held by "multiple custodians, departments, and systems" are similarly insufficient.[19]

The proportionality factors thus strongly weigh toward Relator's discovery requests, especially when considering the availability of sampling.

**C. Sampling**

Relator has expressed a desire to address proportionality concerns through a detailed sampling plan involving five providers and five years, with limited custodians and search terms.[20] *See Ni v. HSBC Bank USA, N.A.*, 2024 WL 863699, at *2 (S.D. N.Y. Feb. 29, 2024) (courts can address proportionality through sampling even when involving "effort and time"); *see also United States ex rel. Pilat v. Amedisys, Inc.*, No. 17-CV-136-JLS(F), 2025 WL 2962663, at *2 (W.D. N.Y. Oct. 21, 2025) (any concerns over proportionality can be "obviated through sampling"); *Hodges v. Admin. Sys., Inc.*, 2026 WL 1135986, at *2 (N.D. Miss. Apr. 26, 2026) (sampling can allow "further discovery [] if the initial sample provide[s] a basis for doing so"). During a prior chambers conference, the Court instructed the parties to work together on a search term protocol. Such a protocol would reduce Defendants' burden. Further, the

[18] R. Doc. 150 at 11.
[19] R. Doc. 147 at 22.
[20] R. Doc. 143-2 at 6.

parties' prior inability to confirm a sampling plan seems to rest on the temporal contention of whether discovery can surpass 2017.[21] Since the Court has answered this question affirmatively, sampling should prove an appropriate method to open discovery while still mitigating Defendants' burden.

## IV. Conclusion

Relator's amended complaint alleges with particularity and specificity an ongoing scheme, including facts suggesting that the scheme would remain in place even after the filing of the complaint. Her recent declaration provides some corroboration for this claim and undercuts the assertion that this is a "fishing expedition."

Accordingly,

**IT IS ORDERED** that Relator's Motion to Compel (R. Doc. 143) is **GRANTED**. Defendants are to produce (1) Defendants' compensation and incentive structure for clinical employees, (2) claims information and acquisition and pricing information for Defendants' claims for skin substitute products, (3) internal audits, claims denials, or assessment of the medical necessity of Defendants' wound care services, (4) communications, policies, and educational materials regarding the medical necessity of Defendants' wound care services and practices, and (5) Defendants' medical records specific wound care services provided to Medicare and Medicaid patients.

[21] R. Doc. 147 at 5-6.

**IT IS FURTHER ORDERED** that the parties shall confer to reach an agreed-upon sampling plan relative to the medical records set forth above within 21 days.

New Orleans, Louisiana, this 22nd day of October, 2026.

EVA J. DOSSIER
UNITED STATES MAGISTRATE JUDGE